**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| ACE AMERICAN INSURANCE COMPANY, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. 07-2796 |
| HUNTSMAN CORPORATION and INTERNATIONAL RISK INSURANCE COMPANY, | § § § § | |
| Defendants. | § § | |

**MEMORANDUM AND OPINION**

The plaintiffs in this case are reinsurance companies (the "Reinsurers")[1] seeking to compel arbitration of certain disputes relating to, or to obtain a declaratory judgment establishing, the rights and liabilities arising from reinsurance certificates.  The defendants are Huntsman Corporation ("Huntsman"), the insured, and its captive insurance company, International Risk Insurance Company ("IRIC").  Huntsman has moved to dismiss under Federal Rule of Civil Procedure 12(b)(6).  IRIC has moved to dismiss under Rules 12(b)(1) and 12(b)(6).  The Reinsurers have moved to enjoin related state-court litigation.

---

[1]   The "Reinsurers" are Ace American Insurance Company, AIG Casualty Company f/k/a Birmingham Fire Insurance Company of Pennsylvania, Allianz Global Risks US Insurance Company, Arch Reinsurance Company of Nebraska, AXIS Speciality Limited Bermuda, Limit No. 2, Ltd., Commonwealth Insurance Company, HDI Industrie Versicherung AG, Simon Andrew White as Lead Underwriter for Heritage Syndicate 1200 ROC at Lloyd's (in his individual capacity), R. J. Kiln & Company, Ltd., Cathedral Underwriting, Ltd., Munich Reinsurance Company, Partner Reinsurance Company, Ltd., SCOR UK Company, Ltd., Swiss Reinsurance Company, Wurttembergische Versicherung AG, and Zurich American Insurance Company.

Based on careful consideration of the motions, the pleadings, the parties' submissions, and the applicable law, the motions to dismiss are denied and the motion to enjoin the related state-court litigation is denied as moot.  The reasons are explained in detail below.

## I.    Background

On April 29, 2006, a fire occurred at Huntsman's Aromatics & Olefins Plant ("the Plant") in Port Arthur, Texas.  (Docket Entry No. 1 at ¶ 30).  As a result of the fire, Huntsman suspended Plant operations.  (*Id.*).  The loss was allegedly insured by Policy PROP 05-01 (the "Huntsman-IRIC Policy"), with effective dates from July 1, 2005 through July 1, 2006.  (*Id.* at ¶ 27).  Under the Policy, IRIC is responsible for insuring Huntsman, including its parent, affiliated, subsidiary, and associated companies, for 100% of the designated risk up to a certain amount.  (*Id.* at ¶ 28).  IRIC reinsures 100% of the designated risk through certificates (the "Reinsurance Certificates") issued by various reinsurers, including the plaintiffs in this case.  (*Id.*).  IRIC is a "captive" insurance company, wholly owned and controlled by Huntsman, formed to obtain insurance coverage for Huntsman companies through the international reinsurance market.  (*Id.* at ¶ 26).

After the fire, Huntsman notified both IRIC and the Reinsurers of the Plant damage and of the intent to submit an insurance claim.  (Docket Entry No. 1 at ¶ 31).  The Reinsurers' complaint states that Huntsman made a claim directly to the Reinsurers for the Plant losses.  (*Id.* at ¶ 32).  According to the complaint, "[t]hroughout the adjustment of Huntsman's claim, Huntsman has dealt directly with the Reinsurers, and the Reinsurers have issued non-allocated interim payments to Huntsman."  (*Id.*).  The complaint asserts that

2

"IRIC has not acted as a traditional insurance carrier in the adjustment of a loss, but has instead, by its actions and/or inaction, adopted all of Huntsman's coverage positions." (*Id.*). The complaint alleges that "IRIC has routinely failed to participate in meetings between Huntsman and the Reinsurers where coverage, quantum and related issues were addressed." (*Id.*). The complaint alleges that the Reinsurers have made substantial interim payments to Huntsman pursuant to proofs of loss the adjuster prepared and submitted to Huntsman, which Huntsman signed and returned directly to the Reinsurers through the adjuster. (*Id.* at ¶ 33).

On July 18, 2007, Huntsman submitted an unsolicited proof of loss directly to the Reinsurers through the adjuster. (Docket Entry No. 1 at ¶ 33). The Reinsurers disputed this proof of loss. (*Id.*). On August 8, 2007, the Reinsurers notified Huntsman that more time was needed to evaluate the new proof of loss and that a decision would be made by September 22, 2007. (*Id.* at ¶ 35). On August 17, 2007, Huntsman informed the Reinsurers that a response was required by August 31, 2007. (*Id.* at ¶ 36). The Reinsurers allegedly sought more time to analyze the proof of loss. (*Id.*). The complaint alleges that "Huntsman claims that it is entitled to additional interim payments from the Reinsurers pursuant to the Certificates, while the Reinsurers dispute and deny that Huntsman is entitled to any further payments at this time." (*Id.* at ¶ 38). On August 30, 2007, the Reinsurers sued Huntsman and IRIC in this court, seeking to compel arbitration or, alternatively, to obtain a declaratory judgment resolving coverage issues. (*See generally* Docket Entry No. 1).

On September 21, 2007, Huntsman filed a related case against IRIC in the 58th Judicial District Court of Jefferson County, Texas (the "Huntsman Case"). Huntsman's

3

claims in that case include breach of contract and anticipatory breach of contract.  Huntsman also sought a declaratory judgment that IRIC is obligated to pay the amounts demanded by Huntsman for the Plant losses from the fire.  On December 12, 2007, IRIC filed its third-party petition in the Huntsman Case, seeking a declaratory judgment that the Reinsurers are obligated to accept the tender of defense, or, alternatively, an order compelling arbitration.  The Reinsurers removed the Huntsman Case to the Eastern District of Texas, which transferred the case to this court.  By separate opinion issued in the Huntsman Case, this court is denying the Reinsurers' motion to remand that case to state court.

Huntsman has moved to dismiss the Reinsurers' complaint in this case under Rule 12(b)(6).  (Docket Entry No. 8).  Huntsman argues that there is no basis for the Reinsurers to compel arbitration because Huntsman is not a party to the Reinsurance Certificates containing arbitration provisions.  (*See id.* at 1–2).  Huntsman contends that its contract is only with IRIC and that the Huntsman-IRIC Policy contains a forum-selection clause giving Huntsman the right to assert claims under that Policy in the court it chooses.  (*Id.*).  Huntsman argues that the fact that IRIC is a captive insurer does not make the parties' contractual relationships irrelevant.  (*See id.* at 2).  Huntsman also contends that the Reinsurers have failed to show a basis to compel arbitration under the Reinsurance Certificates under theories of assumption, agency, alter ego, or estoppel.  (*Id.*).  Huntsman further contends that the declaratory-judgment claims should be dismissed because there is no contractual privity between Huntsman and the Reinsurers.  (*Id.*).  Huntsman also argues that there is no justiciable controversy between the Reinsurers and Huntsman. (Docket Entry

4

No. 8 at 2–3).  Huntsman further asserts that the Huntsman Case is the appropriate action in which to resolve Huntsman's claims for insurance coverage under the Huntsman-IRIC Policy, explaining that because the Reinsurers' obligations follow IRIC's liabilities to Huntsman, arbitration should only occur if disputes between IRIC and the Reinsurers remain after Huntsman's coverage claims against IRIC are resolved.  (*Id.* at 3).

IRIC has moved to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction.  (Docket Entry No. 11 at 7–12).  IRIC argues that there has been no finding of its liability to Huntsman, and that because the Reinsurers' liability follows IRIC's liability to Huntsman, any determination of the Reinsurers' liability would be speculative.  (*Id.* at 8–9).  In addition, IRIC argues that the arbitration clause in the Reinsurance Certificates requires negotiation and mediation before arbitration and the Reinsurers have not alleged that IRIC failed to negotiate or mediate.  (*Id.* at 10).  For similar reasons, IRIC argues that the Reinsurers do not have standing to sue IRIC because the Reinsurers have failed to allege a concrete, nonspeculative injury.  (*Id.* at 3).  IRIC further asserts that the Reinsurers' claim to compel arbitration must be dismissed for failure to state a claim under Rule 12(b)(6).  (*Id.* at 3–4).  As with the request for dismissal under Rule 12(b)(1), IRIC contends that dismissal is proper because its liability to Huntsman has not yet been determined and because the Reinsurance Certificates require negotiation and mediation before resort to arbitration.  (*Id.* at 13–14).  Finally, IRIC contends, for similar reasons, that the Reinsurers' declaratory-judgment claim must be dismissed under Rule 12(b)(1) because it is based on speculative facts that may never develop.  (Docket Entry No. 11 at 4).  IRIC's arguments amount to a request for

dismissal of the entire complaint.

## II.     The Legal Standards for Motions to Dismiss

### A.     Rule 12(b)(1)

A claim may not be dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1) unless it appears certain that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *See Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough*, 354 F.3d 348, 351 (5th Cir. 2003); *Home Builders Ass'n of Miss., Inc. v. Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted). A case is properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate it. *Home Builders Ass'n of Miss.*, 143 F.3d at 1010 (citation omitted). A court may find lack of subject-matter jurisdiction based on the complaint alone, the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citation omitted); *Clark v. Tarrant County, Tex.*, 798 F.2d 736, 741 (5th Cir. 1986) (citation omitted). The party asserting jurisdiction bears the burden of proof on a Rule 12(b)(1) motion to dismiss and must show that jurisdiction exists. *Ramming*, 281 F.3d at 161.

A party may make either a "facial" or a "factual" attack on the court's jurisdiction. *See Levin v. Minn. Life Ins. Co.*, No H-07-1330, 2008 WL 2704772, at *2 (S.D. Tex. July 7, 2008) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981)). "A facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence, challenging the

court's jurisdiction based solely on the pleadings." *Id.* (citing *Lawrence v. Dunbar*, 919 F.2d

1525, 1529 (11th Cir. 1990); *Paterson*, 644 F.2d at 523). "When presented with a facial

challenge to subject matter jurisdiction, the court must accept all allegations in the complaint

as true." *Id.* (citing *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256,

1261 (11th Cir. 1997); *Paterson*, 644 F.2d at 523). In contrast, when examining a factual

challenge to subject-matter jurisdiction under Rule 12(b)(1) that does not implicate the merits

of the plaintiff's cause of action, the district court has the authority "'to weigh the evidence

and satisfy itself as to the existence of its power to hear the case.'" *Garcia*, 104 F.3d at 1261

(quoting *Lawrence*, 919 F.2d at 1529). If the factual attack on the court's subject-matter

jurisdiction also implicates an element of the plaintiff's cause of action, "'[t]he proper course

of action . . . is to find that jurisdiction exists and deal with the objection as a direct attack

on the merits of the plaintiff's case.'" *Id.* (quoting *Williamson v. Tucker*, 645 F.2d 404,

415–16 (5th Cir. 1981)).

### B.      Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief

may be granted." The Supreme Court has clarified the standards that apply in a motion to

dismiss for failure to state a claim. In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955

(2007), the Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a),

which requires "'a short and plain statement of the claim showing that the pleader is entitled

to relief.'" *Twombly*, 127 S. Ct. at 1964 (quoting FED. R. CIV. P. 8(a)(2)). A court will

dismiss a complaint for failure to state a claim if the plaintiff has failed to plead "enough

7

facts to state a claim to relief that is plausible on its face." *Id.* at 1974; *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007) (per curiam) (quoting *Twombly*, 127 S. Ct. at 1974).  "[A] plaintiff is obligated to provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'"  *Bradley v. Phillips Petroleum Co.*, 527 F. Supp. 2d 625, 636 (S.D. Tex. 2007) (quoting *Twombly*, 127 S. Ct. at 1964–65).  "'Rule 8(a)(2) still requires a showing, rather than a blanket assertion, of entitlement to relief.  Without some factual allegation in the complaint it is hard to see how a claimant could satisfy the requirement of providing not only fair notice of the nature of the claim, but also grounds on which the claim rests.'"  *Id.* (quoting *Twombly*, 127 S. Ct. at 1965 n.3).  "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'"  *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1964–65) (footnote omitted); *Sonnier*, 509 F.3d at 675 (quoting *Twombly*, 127 S. Ct. at 1965).  "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'"  *Cuvillier*, 503 F.3d at 401 (quoting *Twombly*, 127 S. Ct. at 1966) (additional internal quotation marks omitted).

Although material allegations in the complaint must be accepted as true and construed in the light most favorable to the nonmoving party, a court is not required to accept

8

conclusory legal allegations cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. When a "conclusory allegation" or an "unclear question of law" appears within the factual allegations of the complaint, the court retains discretion to construe that issue against the plaintiff. *See, e.g.*, *Kansa Reinsurance Co., Ltd. v. Cong. Mortgage Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994) ("While the district court must accept as true all factual allegations in the complaint, it need not resolve unclear questions of law in favor of the plaintiff.") (citation omitted).

In considering a Rule 12(b)(6) motion to dismiss, a court must limit itself to the contents of the pleadings, with an exception. In *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000), the Fifth Circuit approved the district court's consideration of documents the defendant attached to a motion to dismiss. The Fifth Circuit made it clear that "such consideration is limited to documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (citing *Collins*, 224 F.3d at 498–99). Other courts approve the same practice, stating that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (citations omitted); *see also Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1998) (citation omitted); *Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

When "matters outside the pleadings" are submitted in support of or in opposition to

9

a Rule 12(b)(6) motion to dismiss, Rule 12(b) grants courts discretion to accept and consider those materials, but does not require them to do so. *See Prager v. LaFaver*, 180 F.3d 1185, 1188–89 (10th Cir. 1999); *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988) (quoting 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366 (1969)).   A court exercises this discretion by determining whether the proffered material, and the resulting conversion from the Rule 12(b)(6) to the Rule 56 procedure, is likely to facilitate disposing of the action. *Isquith*, 847 F.2d at 193 n.3.  If the court decides to consider such extraneous material, then the court must treat the Rule 12(b)(6) motion as a motion for summary judgment under Rule 56.  FED. R. CIV. P. 12(d). If the court refuses to consider those materials outside the pleadings, then the Rule 12(b)(6) motion remains intact and may be decided on its merits under the appropriate standard of review.

If the court accepts matters outside the pleading and converts the motion to dismiss into one for summary judgment, the court is to give the parties notice of the changed status of the motion and a "'reasonable opportunity to present all materials made pertinent to such a motion by Rule 56.'" *Festa v. Local 3 Int'l Bhd. of Elec. Workers*, 905 F.2d 35, 38 (2d Cir. 1990) (quoting former FED. R. CIV. P. 12(b)).  The key is whether the losing party has been given adequate notice and an opportunity to supplement the record before summary judgment is granted. *See Clark v. Tarrant County, Tex.*, 798 F.2d 736, 745–46 (5th Cir. 1986) (court's acceptance of material from outside the pleadings was sufficient in itself to notify plaintiffs of the possibility of conversion).

10

III.    **Analysis**

    **A.    Huntsman's Motion to Dismiss the Reinsurers' Claim to Compel Arbitration Under Rule 12(b)(6)**

        **1.    Treatment Under Rule 12(b)(6) or Rule 56**

A threshold issue is whether Huntsman's motion to dismiss is properly decided under Rule 12(b)(6) or whether it should be converted into a motion for summary judgment under Rule 56. Huntsman attached several exhibits to its motion, including an example of one of the Reinsurance Certificates, a copy of the Huntsman-IRIC Policy, a chart listing the companies that provide reinsurance for the Huntsman-IRIC Policy and a description of their coverage responsibility, and a list of the reinsurers to the Huntsman-IRIC Policy that are not plaintiffs in this case. (*See* Docket Entry No. 8, Ex. A). Huntsman also attached a copy of the original petition in the Huntsman Case filed in Jefferson County. (*See id.*, Ex. B). The Reinsurers have submitted with their opposition to Huntsman's motion to dismiss over 200 pages of sealed exhibits that include affidavits, correspondence, proofs of loss, and the petition from the Huntsman Case in Jefferson County, among other documents. (*See* Docket Entry No. 24). In its reply to the Reinsurers' opposition, Huntsman submitted an additional declaration. (Docket Entry No. 28, Declaration of Lee S. Skidmore).[2]

When either the pleader or the moving party submits materials outside the pleadings in connection with a motion to dismiss, the court must convert the motion into a summary judgment motion under Rule 56 if the court chooses to accept the materials outside the

―――――――――――――――

[2] The declaration is not labeled with an exhibit number.

11

pleadings.  *See Downstream Envtl., L.L.C. v. Gulf Coast Waste Disposal Auth.*, No. H-05-1865, 2006 WL 1875959, at *4 (S.D. Tex. July 5, 2006).  When the parties submit materials outside the pleadings in connection with a motion to dismiss, the court has discretion to accept and consider the materials, but is not required to do so.  *Id.* (citing *Prager*, 180 F.3d at 1188–89; *Isquith*, 847 F.2d at 193 n.3).

During oral argument on the motions to dismiss, the Reinsurers argued that they would need discovery and the opportunity to present additional evidence should the motion to dismiss be converted into a motion under Rule 56.  The Reinsurers asked for discovery as to arbitrability, including Huntsman's actions in putting the reinsurance in place and the role Huntsman played in adjusting the claim and in demanding payment.  Huntsman stated that it believed discovery on the merits would be appropriate if the case is not dismissed but asked for two months in which to conduct discovery on the arbitrability issue.  Both Huntsman and the Reinsurers agreed that it would be possible to conduct discovery on the arbitrability issue without substantially encroaching on discovery on the merits.  IRIC suggested that there also ought to be consideration of the parties' course of dealing over the past eight to ten years.

When documents outside the pleadings have been submitted in connection with a motion to dismiss and discovery would be appropriate to resolve the issues raised in that motion, it is appropriate to allow discovery before converting the motion into one for summary judgment.  *See Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 725 (5th Cir. 2003) ("[T]he district court erred by treating Huber's motion for judgment on the

pleadings as a motion for summary judgment without providing Benchmark an opportunity to conduct discovery."), *modified on denial of rehearing on other grounds*, 355 F.3d 356 (5th Cir. 2003); *see also Mitsui Sumitomo, Ins. Co. (H.K.) Ltd. v. P & O Ports La., Inc.*, No. 07-1538, 2007 WL 2463308, at *2 (E.D. La. Aug. 28, 2007) ("A court may choose, in its discretion, not to convert a motion to dismiss into a summary judgment motion when there has been insufficient time for discovery.") (citing *Isquith*, 847 F.2d at 194 n.3; *Elizondo v. Univ. of Tex.*, No. CIVASA-04-CA-1025-XR, 2005 WL 823353, at *7 (W.D. Tex. Apr. 7, 2005); *5 Million Square Feet Cos. v. Crum & Forster*, Civ. A. No. H-06-3956, 2007 WL 1964523, at *1 n.7 (S.D. Tex. July 3, 2007)); *Simmang v. Tex. Bd. of Law Examiners*, 346 F. Supp. 2d 874, 890 (W.D. Tex. 2004) ("[I]f little or no discovery has been conducted on the issue for which the extraneous material was submitted [in connection with a motion to dismiss under Rule 12(b)(6)], the Court may decline to consider the attached materials and decline to convert the motion into a summary judgment motion.") (citations omitted); *Landry v. Specialty Diving of La., Inc.*, No. 02-1746, 2002 WL 31478211, at *2 (E.D. La. Nov. 4, 2002) ("[T]he Court finds that converting Specialty Offshore's 12(b)(6) Motion to Dismiss into a Motion for Summary Judgment is inappropriate at this juncture because the parties have not had the opportunity to complete discovery.  The Court will not consider the affidavits submitted by either Landry [or] Specialty Offshore in support of their claims and decides this motion solely on the pleadings.").

In the *Mitsui Sumitomo* case, the court explained that "[a]t an early point in the litigation, converting a motion to dismiss into a motion for summary judgment may be

inappropriate and likely to lead to continuances and delays pursuant to Federal Rule of Civil

Procedure 56(f)."   2007 WL 2463308, at *2 (citing FED. R. CIV. P. 56(f)).   The court

concluded:

> Due to the early nature of this motion to dismiss [,before any
> discovery had been conducted,] this Court declines the
> opportunity to convert this motion to dismiss into a motion for
> summary judgment, . . . [and] deems it inappropriate to dismiss
> this case based on the pleadings, as the record must be
> developed and matters outside the pleadings considered prior to
> this Court's determining whether dismissal is appropriate.

*Id.* at *3.

In the *Benchmark* case, the Fifth Circuit noted that the district court had not allowed

the parties full discovery and had ordered the defendant to move for summary judgment.

*Benchmark*, 343 F.3d at 725.   The defendant filed a motion for partial summary judgment

on a choice-of-law issue and moved for judgment on the pleadings on the plaintiff's claims.

*Id.*   In so moving, the defendant explained that the court did not need to convert its motion

for judgment on the pleadings into a motion for summary judgment because the attached

exhibits could be considered part of the pleadings.  *Id.* (citing *Venture Assocs. Corp. v. Zenith

Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).   The defendant opposed a motion to lift

a stay on discovery, arguing that it had a Rule 12(c) motion for judgment on the pleadings

pending and that discovery was not yet appropriate.  *Id.* at 725–26.   The plaintiff also treated

the defendant's motion as a motion on the pleadings and agreed that the court could consider

the exhibits without converting the motion into a motion for summary judgment.  *Id.* at 726.

The Fifth Circuit explained that "discovery in a highly fact intensive case like this is critical,"

14

vacated the grant of summary judgment, and remanded for discovery.  *Id.* at 726, 731–32.
The Fifth Circuit found that the plaintiff had been deprived of "a full and fair opportunity to
defend against summary judgment on its claims."  *Benchmark*, 343 F.3d at 726.  The Fifth
Circuit held that "[t]he district court plainly erred in treating Huber's deliberately limited
motion for judgment on the pleadings as a motion for summary judgment without allowing
discovery."  *Id.*

Considering that the Reinsurers have requested discovery regarding at least the
arbitrability issue before summary judgment is considered, this court declines to consider
materials outside the pleadings and does not convert Huntsman's motion to dismiss into a
motion for summary judgment.  In deciding Huntsman's motion to dismiss, this court will
consider only the pleadings and "documents attached to or incorporated into the complaint
and matters of which judicial notice may be taken."  *United States ex rel. Willard v. Humana
Health Plan of Tex. Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) (citing *Lovelace v. Software
Spectrum Inc.*, 78 F.3d 1015, 1017–18 (5th Cir. 1996)).  "'[D]ocuments that a defendant
attaches to a motion to dismiss are considered part of the pleadings if they are referred to in
the plaintiff's complaint and are central to her claim.'"[3]  *Ray v. U.S. Dep't of Homeland Sec.*,

---

[3] The Reinsurers have attached an exemplary Reinsurance Certificate to their complaint. (*See* Docket
Entry No. 1, Ex. 1).  This may be considered in evaluating Huntsman's motion to dismiss.  Huntsman has
attached the Huntsman-IRIC Policy to its motion to dismiss, (*see* Docket Entry No. 8, Ex. A-2), and that
Policy could arguably be considered because it is referred to in the complaint and is arguably a central part
of the Reinsurers' claim to compel arbitration.  However, this court does not need to consider the terms of
the Huntsman-IRIC Policy in order to resolve Huntsman's motion to dismiss.

No. H-07-2967, 2008 WL 3263550, at *5 (S.D. Tex. Aug. 7, 2008) (quoting *Venture Assocs.*, 987 F.2d at 431, and citing *Field*, 850 F.2d at 949).

### 2. The Contractual Language

As its first basis for requesting dismissal, Huntsman argues that the Huntsman-IRIC Policy and the Reinsurance Certificates do not require Huntsman to arbitrate coverage disputes under the Huntsman-IRIC Policy. (*See* Docket Entry No. 8 at 8–11). Huntsman contends that it has a right under the Huntsman-IRIC Policy to litigate any coverage disputes. (*Id.* at 10–11).

Even if Huntsman is correct that it has a contractual right under its Policy with IRIC to litigate coverage disputes, this does not require dismissal of the Reinsurers' claim that Huntsman must arbitrate coverage issues. The Reinsurers have alleged that Huntsman is bound by the arbitration clause in the Reinsurance Certificates as a nonsignatory. (*See* Docket Entry No. 1 at ¶¶ 40–44). The Reinsurers have also stated that they "believe that discovery regarding this fact-intensive issue [whether Huntsman is a signatory to the Reinsurance Certificates] will reveal that Huntsman participated in the creation and drafting of the Certificates and, thus, may well be a signatory under the Certificates." (Docket Entry No. 23 at 14). If plausible, the Reinsurers' assertion that discovery may reveal that Huntsman is in fact a signatory to the Reinsurance Certificates, coupled with the Reinsurers' theories for binding Huntsman to the arbitration provision as a nonsignatory, prevents dismissal on the basis that the Huntsman-IRIC Policy and the Reinsurance Certificates do not require Huntsman to arbitrate.

16

The Reinsurers have alleged in their complaint that Huntsman may be liable under theories of assumption, agency, alter ego, and/or estoppel because Huntsman has assumed IRIC's responsibilities and duties under the Certificates, IRIC is Huntsman's agent in connection with the Reinsurance Certificates, IRIC is a "shell" corporation that is Huntsman's alter ego, and Huntsman has sought and received direct benefits under the Reinsurance Certificates.  (Docket Entry No. 1 at ¶¶ 40–44).  Huntsman's argument that there is no basis for the Reinsurers' claimed right to compel Huntsman to arbitrate is unpersuasive.  Courts in the Fifth and Second Circuits have explained that parties who are not signatories to an arbitration agreement may be required to arbitrate under certain circumstances.[4]  *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003) ("Six theories for binding a nonsignatory to an arbitration agreement have been recognized: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter

---

[4] The Reinsurers have cited Second Circuit case law in their brief and note that the Reinsurance Certificates contain New York choice-of-law provisions.  (*See* Docket Entry No. 23 at 3 n.2).  "Federal courts asked to compel arbitration generally apply state law on contract formation and validity to determine whether contracting parties agreed to arbitrate a dispute.  Federal courts often look to the federal law of arbitrability to determine whether a nonsignatory may be compelled to arbitration, but the cases are not wholly consistent."  *Med-IM Dev., Inc. v. Gen. Elec. Capital Corp.*, No. H-07-1618, 2008 WL 901489, at *3 (S.D. Tex. March 31, 2008) (citing *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005); *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267–68 (5th Cir. 2004) (applying federal law); *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 355–63 (5th Cir. 2003) (applying federal law); *Fleetwood Enters. v. Gaskamp*, 280 F.3d 1069, 1074–77 (5th Cir. 2002) (applying state law); *see also Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 355 (S.D.N.Y. 2005) (reconciling conflicting Second Circuit cases by concluding that "a choice-of-law clause will govern where a nonsignatory to a particular arbitration agreement seeks to enforce that agreement against a signatory, but not where a signatory seeks to enforce the agreement against a nonsignatory. . . .  In the latter case, exemplified by *Sarhank* [*Group v. Oracle Corp.*, 404 F.3d 657 (2d Cir. 2005)], the nonsignatory party opposing arbitration is in essence contending that it is not subject to the contract at all; thus, applying the choice-of-law clause from that contract to determine the issue would beg the question in a manner potentially unfair to the nonsignatory.").  To the extent that federal law controls, Fifth Circuit law would be binding authority and Second Circuit law would be persuasive authority.  Because the parties have focused on the standards in both the Fifth and the Second Circuit, this court addresses both.

17

ego; (e) estoppel; and (f) third-party beneficiary.") (citing *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995); *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 195–97 (3d Cir. 2001); *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003)); *World Omni Fin. Corp. v. ACE Capital Re Inc.*, 64 F. App'x 809, 812 (2d Cir. 2003) (unpublished) ("A party that is not a signatory to a contract containing an arbitration clause is estopped from denying its obligation to arbitrate when it seeks to receive a 'direct benefit' from the contract.") (citing *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999); *Thomson-CSF*, 64 F.3d at 776); *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 61–64 (2d Cir. 2001) (analyzing whether to bind a nonsignatory to an arbitration agreement under: (1) direct-benefits estoppel theory, (2) an alternative estoppel theory that prevents a signatory from avoiding arbitration with a nonsignatory when the issues to be resolved in arbitration are intertwined with the arbitration agreement, and (3) veil-piercing); *Thomson-CSF*, 64 F.3d at 776 ("This Court has made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'") (quoting *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980); *A/S Custodia v. Lessin Int'l, Inc.*, 503 F.2d 318, 320 (2d Cir. 1974)).

In *Thomson-CSF*, the Second Circuit explained the bases on which a nonsignatory may be bound by an arbitration clause.  In that case, Thomson-CSF, S.A. ("Thomson") argued on appeal that the district court had improperly compelled it to arbitrate based on an arbitration agreement between Evans & Sutherland Computer Corporation ("E & S") and

Thomson's subsidiary, Rediffusion Simulation Limited ("Rediffusion"). *Thomson-CSF*, 64 F.3d at 775. The arbitration clause was in an agreement in which Rediffusion agreed to purchase computer-generated image equipment exclusively from E & S and to use its best efforts to market systems containing E & S's equipment, and E & S agreed to supply its imaging equipment only to Rediffusion. *Id.* The arbitration provision stated that all disputes between the "parties" to the agreement had to be arbitrated. *Id.* "Parties" was not a defined term, "E & S" was defined to include E & S's affiliates, and "Rediffusion" was defined to include Rediffusion's affiliates. *Id.* "Affiliates" was defined to include any person, firm, or corporation that, directly or indirectly, controls, or is controlled by, or is under common control with, the party. *Id.* After Rediffusion entered into the agreement containing the arbitration clause, Thomson acquired Rediffusion. *Id.*

When a dispute arose, E & S demanded arbitration under the agreement against both Rediffusion and Thomson. *Thomson-CSF*, 64 F.3d at 776. The district court compelled arbitration, acknowledging that the facts did not fall within the traditional categories for binding a nonsignatory to an arbitration agreement, but adopting a "hybrid" approach that examined the degree of control Thomson exercised over Rediffusion and the interrelatedness of the issues. *Id.* The Second Circuit noted that it had previously recognized five theories for binding nonsignatories to an arbitration agreement, including incorporation by reference, assumption, agency, veil-piercing/alter ego, and estoppel. *Id.* As to the first theory, the court stated that "[a] nonsignatory may compel arbitration against a party to an arbitration agreement when that party has entered into a separate contractual relationship with the

19

nonsignatory which incorporates the existing arbitration clause." *Id.* at 777 (citations omitted). This theory did not apply because E & S had not shown that the agreement was incorporated into any document that Thomson had adopted. *Id.* The court explained that a nonsignatory could be bound under the assumption theory if "its subsequent conduct indicates that it is assuming the obligation to arbitrate." *Id.* Thomson had explicitly disavowed obligations arising out of the agreement; the court found that this precluded finding assumption. *Thomson-CSF*, 64 F.3d at 777. The court similarly found an agency theory inapplicable because the agreement was entered into before Thomson purchased Rediffusion. *Id.* With respect to veil piercing, the court explained that a corporate affiliation is not sufficient to bind a nonsignatory but that "courts will pierce the corporate veil 'in two broad situations: to prevent fraud or other wrong, or where a parent dominates and controls a subsidiary.'" *Id.* (quoting *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993)). E & S conceded that it could not show fraud but argued that veil-piercing was appropriate based on Thomson's domination of Rediffusion. *Id.* The Second Circuit explained that "a parent corporation and its subsidiary lose their distinct corporate identities when their conduct demonstrates a virtual abandonment of separateness." *Id.* at 778 (citing *Carte Blanche*, 2 F.3d at 29). The court concluded that E & S had not demonstrated that Thomson exerted the necessary control over Rediffusion to warrant piercing the corporate veil. *Id.* The court also found that estoppel did not apply because Thomson had never sought to acquire imaging equipment from E & S. *Thomson-CSF*, 64 F.3d at 778–79. The court found that the alleged benefit to Thomson from its purchase of

Rediffusion, eliminating competition, "is not the sort of benefit which this Court envisioned as the basis for estopping a nonsignatory from avoiding arbitration." *Id.* at 779.  The court stated that:

> [h]ad Thomson *directly* benefitted from the Working Agreement by seeking to purchase equipment from E & S or enforcing the exclusivity provisions of the Agreement, it would be estopped from avoiding arbitration.  The benefit which E & S asserts, however, derives directly from Thomson's purchase of Rediffusion, and not from the Working Agreement itself; Thomson received no benefit at all from the Working Agreement (as opposed to the acquisition).

*Id.*  The Second Circuit declined to apply an alternative estoppel theory recognized by some other courts, which would "estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Id.*  The court found the alternate estoppel theory inapplicable because the signatory sought to compel the nonsignatory to arbitrate. *Id.* Finally, the appellate court rejected the district court's "hybrid" approach, holding that a nonsignatory cannot be bound to arbitrate on grounds other than accepted agency or contract law principles. *Id.* at 780.

The Fifth Circuit is among those recognizing grounds for binding a nonsignatory to an arbitration agreement. *See The Rice Co. (Suisse), S.A. v. Precious Flowers Ltd.*, 523 F.3d 528, 536–37 (5th Cir. 2008) (recognizing six theories for binding a nonsignatory to an arbitration agreement); *JP Morgan Chase & Co. v. Conegie ex rel. Lee*, 492 F.3d 596, 600 (5th Cir. 2007) (binding a nonsignatory on a third-party beneficiary theory); *Bridas*, 345 F.3d

at 356 (listing theories for binding a nonsignatory); *S. Energy Homes, Inc. v. Godwin*, 183 F. App'x 441, 444 (5th Cir. 2006) (unpublished) (noting that the Fifth Circuit has held that "equitable estoppel may be used to compel non-signatories to arbitrate.") (citing *Wash. Mut. Fin. Group, L.L.C. v. Bailey*, 364 F.3d 260, 267 (5th Cir. 2004)); *cf. Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517 (5th Cir. 2006) (binding a nonsignatory to a forum-selection clause under a direct-benefits estoppel theory)   Huntsman's argument that the Reinsurance Certificates do not require it to arbitrate is not sufficient for dismissal.

Huntsman also contends that the Reinsurers' conclusory assertions that Huntsman dealt directly with them are not sufficient to vitiate the forum-selection clause in the Huntsman-IRIC Policy.  (Docket Entry No. 8 at 13).  The Reinsurers have alleged that Huntsman's direct dealings with the Reinsurers bind Huntsman under theories of assumption, agency, alter ego, and/or estoppel.  (*See* Docket Entry No. 1 at ¶¶ 40–44).  These theories are each examined below.

### 3.    Assumption

Huntsman contends that the Reinsurers have not pleaded facts showing Huntsman's active and voluntary participation in arbitration with the Reinsurers, which Huntsman argues is required to rely on assumption.  (Docket Entry No. 8 at 14 (citing *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1105 (2d Cir. 1991); *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 532 (5th Cir. 2000)).  In *Gvozdenovic*, the court held that "[a]lthough a party is bound by an arbitral award only where it has agreed to arbitrate, an agreement may be implied from the party's conduct."  *Gvozdenovic*, 933 F.2d at 1105 (citations omitted).

22

The appellants in that case argued that they were not parties to an arbitration agreement and could not be bound by its outcome. *Id.* The court concluded that because the appellants took an active and voluntary role in the arbitration and there was no evidence that they objected to arbitration or refused to arbitrate, they were bound by the arbitration award. *Id.* Although the court found that the appellants were bound by their participation in the arbitration proceedings, the court did not state that this would be the only basis to apply the assumption theory for binding a nonsignatory. In *Thomson-CSF*, the Second Circuit reaffirmed binding a nonsignatory under an assumption theory, stating that "[i]n the absence of a signature, a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate." *Thomson-CSF*, 64 F.3d at 777 (citing *Gvozdenovic*, 933 F.2d at 1105; *In re Arbitration Between Keystone Shipping Co. and Texport Oil Co.*, 782 F. Supp. 28, 31 (S.D.N.Y. 1992); *In re Transrol Navegacao S.A.*, 782 F. Supp. 848, 851 (S.D.N.Y. 1991)); *see also Castlewood (US), Inc. v. Nat'l Indem. Co.*, No. 06-CV-6842(KMK), 2006 WL 3026039, at *5 (S.D.N.Y. Oct. 24, 2006) ("To be bound under this theory [of assumption], a nonsignatory must 'manifest[ ] a clear intent to arbitrate the dispute.'") (quoting *Gvozdenovic*, 933 F.2d at 1105; and citing *In re Arbitration Between Promotora da Navegacion, S.A. v. Sea Containers, Ltd.*, 131 F. Supp. 2d 412, 417 (S.D.N.Y. 2000)). In *Castlewood*, the court stated that "[a]bsent such a showing [of intent to arbitrate an issue], the assumption exception cannot apply." *Castlewood*, 2006 WL 3026039, at *5.

23

The Reinsurers' complaint alleges that "[b]y dealing directly with the Reinsurers regarding its claims, Huntsman has assumed and taken upon itself all of IRIC's responsibilities and duties under the Certificates." (Docket Entry No. 1 at ¶ 41). The Reinsurers have not alleged that Huntsman took actions evidencing an intent to arbitrate any dispute with the Reinsurers. The unsupported allegation of assumption does not avoid dismissal.

### 4.    Agency

Huntsman also contends that the Reinsurers have not adequately pleaded facts to bind Huntsman to arbitrate under agency principles. (Docket Entry No. 8 at 15). Huntsman argues that the Reinsurers have failed to plead that the person who signed the arbitration agreement did so as an agent for Huntsman. (*Id.*). In *Bridas*, the Fifth Circuit noted that the signatory to an arbitration agreement was "entitled to a 'presumption of independent status.'" *Bridas*, 345 F.3d at 356 (quoting *Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 176 (5th Cir. 1989)). The *Bridas* court explained:

> Agency is "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." RESTATEMENT (SECOND) OF AGENCY § 1(1) (1958)). An agency relationship may be demonstrated by "written or spoken words or conduct, by the principal, communicated either to the agent (actual authority) or to the third party (apparent authority)."

*Id.* at 356–57 (citations omitted). The Reinsurers' complaint alleges generally that "IRIC is the agent for Huntsman, and Huntsman is IRIC's principal," (Docket Entry No. 1 at ¶ 42),

and that "IRIC was created by Huntsman for the purpose of obtaining insurance for Huntsman through the international reinsurance market . . . ," (*id.* at ¶ 26).  Although the complaint asserts that IRIC was created for the purpose of obtaining insurance for Huntsman, there is no allegation that IRIC acted on Huntsman's behalf or as Huntsman's agent in signing the Reinsurance Certificates with the arbitration clause.  The Reinsurance Certificates indicate that they were entered only on IRIC's behalf.  (*See* Docket Entry No. 1, Ex. 1 at § (C)(3) ("This Agreement is solely between the Reinsured [IRIC] and the Reinsurer, and save as provided in Article 10 (Insolvency) no Original Insured, claimant or other third party shall have any rights under this Agreement.")).  Absent allegations that IRIC acted as Huntsman's agent in procuring the Reinsurance Certificates, the conclusory statement that IRIC is generally Huntsman's agent is not sufficient to survive a motion to dismiss.

### 5.    Alter Ego; Piercing the Corporate Veil

Huntsman further contends that the Reinsurers have improperly invoked alter ego. (Docket Entry No. 8 at 15).  According to Huntsman, "[t]he alter ego theory can be used to compel a non-signatory to arbitrate 'only if (1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil.'"  (*Id.* (quoting *Bridas*, 345 F.3d at 359)).  Huntsman argues that the Reinsurers have not alleged that control was used to commit a fraud or wrong that injured the Reinsurers, and that the Reinsurers knew that IRIC was a captive insurer when they entered into the Reinsurance Certificates. (*Id.*).  The Reinsurers counter that New York and the Second Circuit have allowed piercing

25

the corporate veil on a showing of either fraud or the use of a corporation as an alter ego. (Docket Entry No. 23 at 20 (citing *Thomson-CSF*, 64 F.3d at 777; *In re Sbarro Holding, Inc.*, 456 N.Y.S.2d 416, 417 (N.Y. 1982))).  The Reinsurers acknowledge that Second and Fifth Circuit cases have more recently found that a party seeking to pierce the corporate veil must show both fraud *and* the use of an alter ego.  (*Id.*).  The Reinsurers argue that other courts in the Second Circuit have continued to apply the test disjunctively, requiring only a showing of fraud or domination.  (*Id.* at 20–21 (citing *SAT Int'l Corp. v. Great White Fleet (US) Ltd.*, No. 03 Civ. 7481(KNF), 2006 WL 661042, at *14 (S.D.N.Y. March 16, 2006); *Tellium, Inc. v. Corning Inc.*, No. 03 Civ. 8487(NRB), 2004 WL 307238, at *7 (S.D.N.Y. Feb. 13, 2004))).  The Reinsurers also contend that if they are required to show a wrong, they have done so by alleging that Huntsman bypassed IRIC and dealt with the Reinsurers directly, and by arguing that after the Reinsurers filed this action, Huntsman submitted a demand for payment to IRIC, sued IRIC, and moved to dismiss this action, all on the same day.  (*Id.* at 23–24).

Federal courts often look to the federal law of arbitrability to determine whether a nonsignatory may be compelled to arbitration, but the cases are not wholly consistent.  *Med-IM Dev., Inc. v. Gen. Elec. Capital Corp.*, No. H-07-1618, 2008 WL 901489, at *3 (S.D. Tex. March 31, 2008) (citations omitted); *see also Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267 n.6 (5th Cir. 2004) (noting that whether state or federal law applies is "often an uncertain question," but that "nearly all federal circuit courts faced with the specific question posed by [the nonsignatory]—namely, to what extent a non-signatory is

bound by an arbitration provision contained in a contract she is suing under—have applied the federal substantive law of arbitrability to resolve the issue.") (citations omitted); *Wood v. PennTex Resources, L.P.*, 458 F. Supp. 2d 355, 361 (S.D. Tex. 2006) ("The courts have recognized, however, that while state law determines whether contracting parties agreed to arbitrate under their contract, it is 'not entirely clear what substantive law governs whether a non-party must arbitrate.'") (quoting *In re Weekley Homes*, 180 S.W.3d 127, 130 (Tex. 2005)).  To the extent that state law applies to determine whether to bind a nonsignatory, courts have held that the law of the state of incorporation for the entity whose corporate form is at issue applies to determine whether to pierce the corporate veil.  *See Davaco, Inc. v. AZ3, Inc.*, No. 3:07-cv-803, 2008 WL 2243382, at *1 (N.D. Tex. May 30, 2008) ("[T]he law of Quebec, Couvrette's state of incorporation, provides the relevant law for the veil-piercing analysis.") (citing *Ingenius Invs., Inc. v. Bombart*, No. 4:05-CV-535-A, 2006 WL 1582080, at *3 (N.D. Tex. Jan. 20, 2006); *Amoco Chem. Co. v. Tex Tin Corp.*, 925 F. Supp. 1192, 1201 (S.D. Tex. 1996)); *ASARCO LLC v. Americas Min. Cop.*, 382 B.R. 49, 65 (S.D. Tex. 2007) ("Other federal courts faced with alter ego issues have also 'look[ed] to the law of the State of incorporation for each [corporation] to determine *whether its corporate entity should be disregarded*.'") (quoting *Amoco Chem. Co.*, 925 F. Supp. at 1202), *reconsidered in part on other grounds*, Civ. No. 1:07-CV-00018, 2008 WL 4009927 (S.D. Tex. Aug. 30, 2008).  In addition, "[a] choice of law provision in a contract does not alter the rule that the law of the state of incorporation governs the alter ego analysis."  *Davaco*, 2008 WL 2243382, at *1 (citations omitted).  Other cases are unclear as to which corporation's law to apply.

27

According to the complaint, Huntsman is a Delaware corporation, (Docket Entry No. 1 at ¶ 20), and IRIC is a Utah corporation, (*id.* at ¶ 21).   The parties have not briefed Delaware or Utah law on piercing the corporate veil.  To the extent federal law applies, Fifth Circuit precedent is binding.  The Fifth Circuit has held that piercing the corporate veil is only appropriate on a showing of both control and that the control was used to commit a fraud or wrong injuring the party seeking to pierce the corporate veil.  *Bridas*, 345 F.3d at 359 (citations omitted).  "Alter ego determinations are highly fact-based, and require considering the totality of the circumstances in which the instrumentality functions."  *Id.* (citing *Estate of Lisle v. Comm'r*, 341 F.3d 364, 375–76 (5th Cir. 2003), *mandate modified on other grounds*, 431 F.3d 439 (5th Cir. 2005)).  The *Bridas* court explained:

> Once it has been determined that the corporate form was used to effect fraud or another wrong upon a third-party, alter ego determinations revolve around issues of control and use.  On remand, the court should explore the totality of the environment in which [the allegedly controlled party] operated, including those factors normally explored in the context of parent-subsidiary alter ego claims, such as whether:
>
> > (1) the parent and subsidiary have common stock ownership; (2) the parent and subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operated with grossly inadequate capital; (8) the parent pays salaries and other expenses of subsidiary; (9) the subsidiary receives no business except that given by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of

28

> the two corporations are not kept separate; (12) the subsidiary does not observe corporate formalities.
>
> [*Estate of Lisle*, 341 F.2d] at 375 n.16 (citing *Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 n.2 (5th Cir. 2000)). Additional factors include: (1) whether the directors of the "subsidiary" act in the primary and independent interest of the "parent,"; (2) whether others pay or guarantee debts of the dominated corporation; and (3) whether the alleged dominator deals with the dominated corporation at arms length.

*Bridas*, 345 F.3d at 360 n.11 (additional internal citations omitted).

Delaware law also requires a showing of fraud or similar injustice to pierce the corporate veil. *See Mason v. Network of Wilmington, Inc.*, No. Civ.A. 19434-NC, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005) (unpublished) ("'Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice. Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.'") (quoting *Wallace ex rel. Cencorn Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999)); *see also Harco Nat'l Ins. Co. v. Green Farms, Inc.*, Civ. A. No. 1131, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989) (unpublished) ("Fraud has traditionally been sufficient reason to pierce the corporate veil. Other grounds also exist. In *Pauley* [*Petroleum, Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968)], the Supreme Court of Delaware stated that the corporate veil may be pierced 'in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where

equitable considerations among members of the corporation require it, are involved.'")[5] (internal citations omitted); *accord ASARCO LLC v. Americas Mining Corp.*, No. 1:07-CV-00018, 2008 WL 4009927, at *21 (S.D. Tex. Aug. 30, 2008) (recognizing that Delaware law on alter ego "requires that the corporate structure cause fraud or some similar injustice," and explaining that "although fraud is not required, an inherent trait of Delaware's alter ego theory is injustice or unfairness."). A Delaware court has explained that "[a]lthough the legal test for [piercing the corporate veil] 'cannot be reduced to a single formula that is neither over[ ]nor under-inclusive,' our courts have only been persuaded to 'pierce the corporate veil' after substantial consideration of the shareholder-owner's disregard of the separate corporate fiction and the degree of injustice impressed on the litigants by recognition of the corporate entity." *Midland Interiors, Inc. v. Burleigh*, No. CIV.A. 18544, 2006 WL 3783476, at *3 (Del. Ch. Dec. 19, 2006) (unpublished) (footnotes omitted).

Utah law on piercing the corporate veil is similar. Fraud or injustice is required to find that a corporation functions as an alter ego. *See d'Elia v. Rice Dev., Inc.*, 147 P.3d 515, 522 (Utah Ct. App. 2006) (quoting *Envirotech Corp. v. Callahan*, 872 P.2d 487, 499 (Utah Ct. App. 1994)); *see also Chatterley v. Omnico, Inc.*, 485 P.2d 667, 670 (Utah 1971) (agreeing with the defendants' contention that "'[s]ome element of unfairness, something akin to fraud or deception, must be present in order to disregard the corporate fiction.'") (citing *Am. Trading & Prod. Corp. v. Fischback & Moore, Inc.*, 311 F. Supp. 412, 416 (N.D.

---

[5] The court noted that at the time of the opinion, Delaware courts had not explicitly adopted the alter ego theory of piercing the corporate veil, but that the federal district court in Delaware had accepted the theory. *Harco*, 1989 WL 110537, at *4.

Ill. 1970)).  In *d'Elia*, the court noted:

> [T]o disregard the corporate entity under the equitable alter ego
> doctrine . . . [requires showing]: "(1) [s]uch a unity of interest
> and ownership that the separate personalities of the corporation
> and the individual no longer exists, but the corporation is,
> instead, the alter ego of one or a few individuals; and (2) if
> observed, the corporate form would sanction a fraud, promote
> injustice, or result in an inequity."

147 P.3d at 522 (quoting *Envirotech*, 872 P.2d at 499).  The court explained that the factors

considered in the first part of this test include:

> (1) undercapitalization of a one-man corporation; (2) failure to
> observe corporate formalities; (3) nonpayment of dividends; (4)
> siphoning of corporate funds by the dominant stockholder; (5)
> nonfunctioning of other officers or directors; (6) absence of
> corporate records; (7) the use of the corporation as a facade for
> operations of the dominant stockholder or stockholders; and (8)
> the use of the corporate entity in promoting injustice or fraud.

*Id.* at 522–23 (quoting *Colman v. Colman*, 743 P.2d 782, 786 (Utah Ct. App. 1987)).  The

second part of the alter ego analysis is referred to as the "fairness requirement" and "its

satisfaction is left 'to the conscience of the court.'"  *Id.* at 523 (quoting *Salt Lake City Corp.*

*v. James Constructors, Inc.*, 761 P.2d 42, 47 (Utah Ct. App. 1988)).

Under Fifth Circuit law, Delaware law, and Utah law, fraud or similar injustice is

generally required to pierce the corporate veil.  The Reinsurers argue that enforcing an

arbitration clause is more akin to enforcing a forum-selection clause or to exercising

jurisdiction than it is to imposing liability.  The Reinsurers assert that in the context of forum-

selection clauses or personal jurisdiction inquiries, courts look only to whether there is

complete domination—not fraud—in determining whether to pierce the corporate veil.

(Docket Entry No. 23 at 21).  But the Delaware courts appear to require a showing of fraud to pierce the corporate veil even in the jurisdictional context.  *See Sprint Nextel Corp. v. iPCS, Inc.*, Civ. A. No. 3746-VCP, 2008 WL 2737409, at *10 (Del. Ch. July 14, 2008) (unpublished) (analyzing personal jurisdiction and noting that "'[u]nder the alter ego or piercing the corporate veil doctrine, courts will ignore the corporate boundaries between parent and subsidiary if fraud or inequity is shown.'") (citation and footnote omitted); *see also Fitzgerald v. Cantor*, No. C.A. 16297-NC, 1998 WL 842316, at *2 (Del. Ch. Nov. 10, 1998) (unpublished) ("This Court will ignore the sanctuary of the corporate form to assert jurisdiction over a nonresident person or entity under the alter-ego theory only in the exceptional case where the complainant can show fraud, injustice, or inequity in the use of the corporate form.") (citation omitted).  The parties have not cited—and this court has not found—Utah cases stating a separate standard for piercing the corporate veil in the context of forum selection or jurisdictional analysis.  However, the Fifth Circuit has noted that fraud is not required for piercing the corporate veil for jurisdictional purposes.  *See Stuart v. Spademan*, 772 F.2d 1185, 1198 n.12 (5th Cir. 1985) ("'[F]or jurisdiction to exist, there need not be both the existence of a mere shell corporation and fraud.  Rather, either factor, a shell corporation or fraud is sufficient by itself to justify jurisdiction.'") (quoting 3A C. SWEARINGEN, FLETCHER'S CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 1296.1, at 81 (Supp. 1984)).

In their complaint, the Reinsurers pleaded the following facts to support piercing the corporate veil:

- "IRIC is a captive insurance carrier, wholly owned and controlled by Huntsman." (Docket Entry No. 1 at ¶ 26).

- "IRIC's offices are physically located in Huntsman's Worldwide Headquarters in Salt Lake City, Utah." (*Id.*).

- "IRIC was created by Huntsman for the purpose of obtaining insurance for Huntsman through the international reinsurance market, of which the Reinsurers are a part." (*Id.*).

- "Presumably because it is merely a 'pass through' or shell company, and because its liability is 100% reinsured, IRIC has not acted as a traditional insurance carrier in the adjustment of a loss, but has instead, by its actions and/or inaction, adopted all of Huntsman's coverage positions." (*Id.* at ¶ 32).

- "IRIC is a mere shell corporation which is dominated and controlled by Huntsman." (*Id.* at ¶ 43).

Accepting these facts as true for the purpose of the motion to dismiss, the facts alleged meet the Rule 8 requirements. The allegations put Huntsman on notice that the Reinsurers seek to bind Huntsman to the arbitration provision in the Reinsurance Certificates under the theory that IRIC was Huntsman's alter ego. The allegations show a plausible basis for the domination element of that claim. *See Twombly*, 127 S. Ct. at 1974 ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."). To the extent the Reinsurers are required to plead fraud to prevail on their alter ego theory, however, the complaint does not allege enough facts. The allegations that IRIC is a shell corporation and a captive insurer are not enough to assert fraud or similar injustice. There is nothing inherently improper about a captive insurance company. *Cf. Humana Inc. v. Comm'r*, 881 F.2d 247, 255 (6th Cir. 1989) (noting in the tax context that "Congress has manifested no intent to disregard the separate corporate entity in

33

the context of captive insurers."). The allegation closest to alleging fraud is that IRIC has not acted as a traditional insurer but has accepted all of Huntsman's coverage positions. But even this allegation does not describe fraudulent conduct. Instead, this alleged conduct fits more neatly into the domination prong of the alter ego analysis. The allegations that IRIC did not act as a traditional insurer and that IRIC accepted all of Huntsman's coverage positions are not sufficient to allege fraud without collapsing the fraud prong into the domination prong.

In the Reinsurers' response to Huntsman's motion to dismiss, the Reinsurers argue that Huntsman acted wrongfully by submitting a payment demand to IRIC and then filing suit against IRIC and moving for dismissal in this action on the same day. (Docket Entry No. 23 at 24). These factual allegations are not in the complaint. Because Delaware law and Utah law appear to require a showing of fraud or similar injustice to proceed under an alter ego theory, and the Fifth Circuit also appears to require a showing of fraud in contexts other than the jurisdictional context, the Reinsurers would need to amend to allege fraud. Whether pleading fraud is necessary under the alter ego theory need not be decided, however, because as discussed later in this opinion, the Reinsurers' claim for arbitration survives dismissal under an estoppel theory.

### 6.    Third-Party Beneficiary

The Reinsurers also argue that dismissal is inappropriate because they have alleged sufficient facts to proceed under a third-party beneficiary theory. (Docket Entry No. 23 at 25–26). The Reinsurers argue that Huntsman receives benefits under the Reinsurance

Certificates, citing provisions stating that the Reinsurers are to directly transmit payment to the Loss Payee identified in the original insurance at Huntsman's request, and provisions requiring the Reinsurers to submit to a United States court at the request of either Huntsman or IRIC.  (*See id.*).  In support of dismissal, Huntsman argues that the Reinsurers did not plead a third-party beneficiary theory in their complaint.  (Docket Entry No. 28 at 18).  Huntsman also argues that the language in the Reinsurance Certificates providing for the direct payment to the Loss Payee is followed by language stating that the Loss Payee shall have no rights under the Reinsurance Certificates and shall not be permitted to bring suit against the Reinsurers under the Certificates.  (*Id.* at 19 n.10).  Huntsman contends that "the mere fact that the IRIC/Reinsurer Certificates require Reinsurers to 'submit to a United States court' at the request of the reinsured or the underlying insured hardly represents an attempt to derive 'direct benefits' from the Certificates."  (*Id.* at 19 n.11 (internal citation omitted)).  Huntsman further contends that even if these provisions in the Reinsurance Certificates were read to provide a benefit to Huntsman, it has not attempted to derive such a benefit from these provisions.  (*Id.* at 19).

In *Bridas*, the Fifth Circuit noted the difference between estoppel and third-party beneficiary theories:

> "Under third party beneficiary theory, a court must look to the intentions of the parties at the time the contract was executed. Under the equitable estoppel theory, a court looks to the parties' conduct after the contract was executed. Thus, the snapshot this Court examines under equitable estoppel is much later in time than the snapshot for third party beneficiary analysis."

*Bridas*, 345 F.3d at 362 (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber &*
*Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 n.7 (3d Cir. 2001)). "'[T]he fact that a person
is directly affected by the parties' conduct, or that he may have a substantial interest in a
contract's enforcement, does not make him a third-party beneficiary.'" *Id.* (quoting *DuPont*,
269 F.3d at 200 n.7).

The *Bridas* court explained that "[p]arties are presumed to be contracting for
themselves only" and that "[t]his presumption may be overcome only if the intent to make
someone a third-party beneficiary is 'clearly written or evidenced in the contract.'" *Id.*
(quoting *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1075–76 (5th Cir. 2002),
*supplemented on denial of rehearing*, 303 F.3d 570 (5th Cir. 2002)); *see also Fleetwood*
*Enters.*, 280 F.3d at 1075–76 (applying Texas law and holding that "Texas will not recognize
[a] person as a third-party beneficiary" absent clear evidence of intent to make someone a
third-party beneficiary is present in the contract).[6]  The *Bridas* court held that the agreement
before it did not show a clear intent to benefit the Government of Turkmenistan, "other than
to the degree ordinarily expected when an instrumentality of a sovereign enters into a
contract to develop the country's natural resources." *Bridas*, 345 F.3d at 362.  The court
found it relevant that the agreement's "integration clause, . . . , specifies that the terms of the
agreement apply only to the parties . . . ." *Id.*  The court also stated that it was "reluctant to
bind the Government to the terms of the JVA on a third-party beneficiary theory because the

---

[6] The parties in *Fleetwood Enterprises* agreed that Texas state law governed this issue.  Under Texas
choice-of-law rules, Texas substantive law applied because the state had the most significant relationship to
the arbitration clause.  *Fleetwood Enters.*, 280 F.3d at 1073, 1073 n.4.

Government has never filed a claim against Bridas premised upon the agreement, or otherwise sought to enforce its terms." *Id.* at 363. The court concluded that "Bridas has not brought to our attention a case where a third-party beneficiary has been bound to arbitrate a dispute, arising under an agreement to which it is not a party, that the third-party itself did not initiate in court," and declined to apply a third-party beneficiary theory. *Id.*

In contrast, if an agreement specifically names a nonsignatory as a recipient of benefits under the contract, the third-party beneficiary theory will bind the nonsignatory to the agreement. *See JP Morgan Chase & Co. v. Conegie ex rel. Lee*, 492 F.3d 596, 600 (5th Cir. 2007) (patient at a nursing home was bound under third-party beneficiary theory by arbitration clause in nursing home admission agreement that patient's mother signed on patient's behalf because the agreement expressly named the patient as the resident receiving care and services from the nursing home).

The Reinsurers' claim against Huntsman to compel arbitration does not survive on the theory of third-party beneficiary. First, the Reinsurers did not plead third-party beneficiary as an independent basis for binding Huntsman to the Reinsurance Certificates. *See* FED. R. CIV. P. 8(a)(2) ("A pleading that states a claim for relief must contain: . . . a short and plain statement of the claim showing that the pleader is entitled to relief."); *cf. Matta v. May*, 888 F. Supp. 808, 813 (S.D. Tex. 1995) ("In [considering a motion to dismiss under Rule 12(b)(6)], the Court examines a complaint to determine if the allegations provide for relief on any possible theory.") (citing *Doss v. S. Cent. Bell Tele. Co.*, 834 F.2d 421, 424 (5th Cir. 1987)). Second, the Reinsurance Certificate attached to the complaint does not state that

37

Huntsman is an intended beneficiary.  Although Huntsman is listed as the original insured on the Reinsurance Certificate, (*see* Docket Entry No. 1, Ex. 1 at 1), and although the Reinsurance Certificate provides for possible direct payment from the Reinsurer to Huntsman at IRIC's request, (*see id.*, Ex. 1 at § (C)(7)), and for the Reinsurer to submit to the jurisdiction of a court within the United States at Huntsman's or IRIC's request,[7] (*see id.*, Ex.

---

[7] Similar service-of-suit clauses have been held insufficient to vitiate an agreement to arbitrate. *See NECA Ins., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 595 F. Supp. 955, 957–58 (S.D.N.Y. 1984); *see also McDermott Int'l, Inc. v. Lloyd's Underwriters of London*, 944 F.2d 1199, 1205 (5th Cir. 1991) ("The service-of-suit clause's 'failure to pay a claim' provision could be interpreted consistent[ly] with the arbitration clause to apply to suits concerning enforcement of an arbitration award.") (citing *NECA*, 595 F. Supp. at 958; *Hart v. Orion Ins. Co.*, 453 F.2d 1358, 1361 (10th Cir. 1971)); *West Shore Pipe Line Co. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 791 F. Supp. 200, 204 (N.D. Ill. 1992) ("The second service of suit clause can therefore reasonably be interpreted to facilitate litigation following arbitration, concerning the validity of enforcement of any arbitration ruling, without curtailing the mandatory arbitration provision in any manner.  Moreover, any waiver of a mandatory arbitration provision should be explicit in view of the federal policy favoring arbitration.").  In *NECA*, the service-of-suit clause provided:

> SERVICE OF SUIT: It is agreed that in the event of the failure of reinsurers hereon to pay any amount claimed to be due hereunder, Reinsurers hereon, at the request of the Company, will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court.

*NECA*, 595 F. Supp. at 957.  The court explained that this service-of-suit clause did not limit the duty to arbitrate in the agreement, stating:

> This [service-of-suit] clause, however, does not by its terms limit the obligation to arbitrate but simply provides a consent to jurisdiction to enforce payments by Reinsurers granted through arbitration.  As the Honorable Charles L. Brieant, Jr. ruled recently when interpreting the relationship between the arbitration and service of suit clauses of a similar contract involving National Union, an arbitration award cannot be enforced without access to the courts.  The service of suit clause is therefore designed to guarantee the enforcement of arbitration awards and is not designed to supercede an obligation to arbitrate disputes within the scope of the arbitration clause.  *See In the Matter of the Petition of J.W. Pryke, et al., For an Order staying the Proceedings in an action Pending in the Court of Common Pleas of Chester County, Pa. Entitled National Union Fire Insurance, et al.*, 83 Civ. 6156 (CLB) (Sept. 8, 1983) (transcript at 10).

1 at Attachment D), these provisions are not sufficient to show that Huntsman was an intended third-party beneficiary.  To the contrary, the Reinsurance Certificate expressly states that Huntsman is not an intended third-party beneficiary: "This Agreement is solely between the Reinsured and the Reinsurer, and save as provided for in Article 10 (Insolvency)[,] no Original Insured, claimant or other third party shall have any rights under this Agreement."  (*Id.*, Ex. 1 at § (C)(3)).  Such express language in the Reinsurance Certificates defeats the argument that the contracting parties intended Huntsman to be a third-party beneficiary.  Finally, the fact that Huntsman has not sued the Reinsurers bolsters the conclusion that Huntsman cannot be bound to arbitrate on a third-party beneficiary theory. *See Wood*, 458 F. Supp. 2d at 373 n.3 ("In *Bridas*, the court made it clear that third-party beneficiary estoppel could not serve as a basis to compel a nonparty to arbitrate if the nonparty had not sued on the contract.") (citing *Bridas*, 345 F.3d at 363).  The Reinsurers' claim to compel Huntsman to arbitrate cannot avoid dismissal on the basis of a third-party beneficiary theory.

### 7.    Estoppel

Huntsman argues that the complaint does not allege sufficient facts to use estoppel to require arbitration.  (Docket Entry No. 8 at 16).  Huntsman contends that the parties understood that insurance proceeds it might receive would ultimately come from the

---

Article XX does not vitiate the terms of Article XVII making arbitration a condition of the agreement.

*Id.* at 958.

Reinsurers. (*Id.*). Huntsman also contends that its actions in directly communicating with the Reinsurers are not sufficient to warrant application of estoppel. (*Id.*). Huntsman also argues that its actions are consistent with the terms of the Huntsman-IRIC Policy. (*Id.* at 16–17).

In *Bridas*, the Fifth Circuit recognized two types of equitable estoppel in the context of arbitration agreements. The first type, based on *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000), "applies only to prevent 'a *signatory* from avoiding arbitration with a nonsignatory when the issues *the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.*'" *Bridas*, 345 F.3d at 361 (emphasis added by the *Bridas* court) (quoting *Thomson-CSF*, 64 F.3d at 779). The court continued: "'[b]ecause arbitration is guided by contract principles, the reverse is not also true: a signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party.'" *Id.* (quoting *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 62 (2d Cir. 2001)). This first type of estoppel does not apply because the nonsignatory, Huntsman, is the party seeking to avoid arbitration.

The second type of estoppel the *Bridas* court recognized is "direct benefits" estoppel. "Direct benefits estoppel applies when a nonsignatory 'knowingly exploits the agreement containing the arbitration clause.'" *Bridas*, 345 F.3d at 361–62 (quoting *DuPont*, 269 F.3d at 199). The *Bridas* court distinguished the facts before it from cases in which "the nonsignatory had brought suit against a signatory premised in part upon the agreement." *Id.*

40

at 362 (citations omitted).  In *Bridas*, the nonsignatory had neither sued a signatory under the agreement nor "exploited" the agreement "to the degree that the cases that consider applying this version of estoppel require." *Id.*  In determining whether direct-benefits estoppel applies, this court must determine whether Huntsman received direct benefits under the Reinsurance Certificates and, if so, whether direct-benefits estoppel can apply when Huntsman has not sued the Reinsurers under the Reinsurance Certificates.

It is unclear whether state or federal law applies to the direct-benefits estoppel analysis.  In *Wood v. PennTex Resources, L.P.*, 458 F. Supp. 2d 355 (S.D. Tex. 2006), this court stated:

> In [*In re*] *Weekley Homes*, [180 S.W.3d 127 (Tex. 2005),] the Texas Supreme Court recognized uncertainty as to whether Texas or federal law governed this analysis [regarding using direct-benefits estoppel to compel arbitration against a nonsignatory].   The court applied Texas law, "while endeavoring to keep it as consistent as possible with federal law." [180 S.W.3d at 131].  Other courts have found that when it is undisputed that there is a valid contract containing an arbitration clause, the issue of whether that agreement applies to a nonsignatory is determined under federal law." *See, e.g.*, *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n, Inc.*, 384 F.3d 157, 160 n.1 (4th Cir. 2004).  The federal courts have also recognized direct-benefits estoppel.

*Wood*, 458 F. Supp. 2d at 367–68; *see also In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005) ("Although state law determines the validity of an arbitration agreement, courts have applied both federal and state law to determine the related, but distinct, issue of whether non-signatory plaintiffs should be compelled to arbitrate their claims.") (citations omitted).  In *Kellogg Brown & Root*, the court noted that the Federal

41

Arbitration Act does not specify whether state or federal law controls the question of whether a nonsignatory should be compelled to arbitrate, and that "the United States Supreme Court has not directly addressed the issue." *Kellogg Brown & Root*, 166 S.W.3d at 738. The *Kellogg Brown & Root* court noted that "[f]ederal courts of appeals, however, have frequently applied federal substantive law when deciding whether a non-signatory must arbitrate." *Id.* (citations omitted). Specifically, the court noted that "[t]he Fourth and Fifth Circuits have reasoned that ''federal substantive law of arbitrability' . . . resolve[s] this question,' because the determination of whether a non-signatory is bound 'presents no state law question of contract formation or validity.'" *Id.* at 738–39 (quoting *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 160 n.1 (4th Cir. 2004); *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267 n.6 (5th Cir. 2004)). The parties have not cited, and this court has not found, cases applying New York state law in the context of direct-benefits estoppel.[8] This court will examine the issue of direct-benefits estoppel under federal

---

[8] The Reinsurance Certificates state that New York law applies. The Fifth Circuit has explained that under Texas choice-of-law rules, contractual choice-of-law provisions are generally enforceable:

> In diversity cases, a federal court must follow the choice of law rules of the forum state, here Texas. *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004). The Supreme Court of Texas has recognized that contractual choice of law provisions should generally be enforced, but has also stated that "the parties' freedom to choose what jurisdiction's law will apply . . . [is not] unlimited. They cannot require that their contract be governed by the law of a jurisdiction which has no relation whatever to them or their agreement. And they cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply."

*Int'l Interests, L.P. v. Hardy*, 448 F.3d 303, 306–07 (5th Cir. 2006) (quoting *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990)). The parties have not briefed whether Texas courts apply a different choice-of-law analysis where there is a contractual choice-of-law provision but the issue is whether to bind a nonsignatory to the contract and the nonsignatory is not the party seeking to enforce the contract. To the

law.

In *Wood*, this court reviewed direct-benefits estoppel cases.  While the *Bridas* court declined to apply direct-benefits estoppel in part because the nonsignatory had not sued the signatory under the agreement containing the arbitration clause and therefore had not "exploited" the agreement containing the clause, *Wood*, 458 F. Supp. 2d at 368, "[o]ther cases have not focused on whether the nonsignatory filed a suit or claim against the signatory based on the agreement containing the arbitration clause but . . . focused instead on whether the evidence showed that the nonsignatory received direct and substantial benefits from that agreement," *id.*  In analyzing direct-benefits estoppel, "[t]he keys are whether the nonsignatory demanded and received substantial and direct benefits under the contract containing the arbitration clause, by suing the signatory under the contract or otherwise; the relationship between the claims to be arbitrated and the contract; and whether equity prevents the nonsignatory from avoiding the arbitration clause that was part of that contract."  *Id.* at 371; *see also AICO Int'l, E.C. v. Merrill Lynch & Co.*, 98 F. App'x 44, 46 (2d Cir. 2004) (unpublished) ("Estoppel of an unwilling non-signatory requires a showing, absent here, that the non-signatory 'knowingly exploited' the benefits of an agreement with an arbitration clause and derived a 'direct benefit' from the agreement.") (citing *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 61–62 (2d Cir. 2001)).

In *Wood*, this court also examined cases evaluating what constitutes a direct benefit

extent state law might apply to this analysis, New York law would seem most appropriate.

for estoppel.  In *Weekley Homes*, the nonsignatory had received direct and substantial

benefits under the contract because:

> "Claiming the authority of the Purchase Agreement, she directed
> how Weekley should construct many of its features, repeatedly
> demanded extensive repairs to 'our home,' personally requested
> and received financial reimbursement for expenses 'I incurred'
> while those repairs were made, and conducted settlement
> negotiations with Weekley (apparently never consummated)
> about moving the family to a new home."

*Wood*, 458 F. Supp. 2d at 367 (quoting *Weekley Homes*, 180 S.W.3d at 133).  The *Weekley*

*Homes* court compelled the nonsignatory to arbitrate under direct-benefits estoppel,

explaining: "'when a nonparty consistently and knowingly insists that others treat it as a

party, it cannot later turn [ ] its back on the portions of the contract, such as an arbitration

clause, that it finds distasteful.  A nonparty cannot both have his contract and defeat it too.'"

*Id.* (quoting *Weekley Homes*, 180 S.W.3d at 135) (footnote and additional internal quotation

marks omitted).  This court also noted in *Wood* that the opinion in *Legacy Wireless Services*

*v. Human Capital, L.L.C.*, 314 F. Supp. 2d 1045 (D. Or. 2004), found direct and substantial

benefits because the nonsignatory had received fees and had "allegedly 'played an important

role in the consummation of the agreement and in assisting [a signatory's] fulfilling its

contractual obligations.'"  *Wood*, 458 F. Supp. at 370 (quoting *Legacy Wireless*, 314 F. Supp.

2d at 1056–57).

   In *Wood*, this court concluded that the nonsignatory had received direct and

substantial benefits because he had participated in negotiating the relevant agreement, was

named in the agreement, and had been involved in the agreement's execution and

44

performance. *Id.*  Other facts supported the conclusion that the nonsignatory received a direct benefit, including that the agreement: provided the nonsignatory with protection against individual exposure from certain claims; indemnified the nonsignatory for certain claims; and named the nonsignatory as an indemnified party. *Id.*  The defendant in *Wood* had complied with its contractual obligations to post a letter of credit to secure the indemnity obligation and to deliver the nonsignatory complete release for certain claims. *Id.* at 371.

In *Hellenic Investment Fund, Inc. v. DET Norske Veritas*, 464 F.3d 514 (5th Cir. 2006), the Fifth Circuit found that a nonsignatory was bound by a forum-selection clause under direct-benefits estoppel.  In *Hellenic*, the nonsignatory purchased a vessel in reliance upon the defendant's issuance of a clean class confirmation certificate. *See Hellenic*, 464 F.3d at 516.  The defendant had conducted the certification inspection pursuant to an agreement with the seller of the vessel. *See id.* at 515–16.  The defendant classification society moved to dismiss based on a forum-selection clause contained in the society's rules. *Id.* at 516–17.  The plaintiff argued that it was not bound by those rules because it was not a signatory to the contract between the seller and the classification society. *See id.* at 517. The Fifth Circuit concluded that the plaintiff was bound to the forum-selection clause in the classification society's rules because the plaintiff directly benefitted from the classification society's performance of its contract with the seller. *Id.* at 519.  In the memorandum of agreement to sell the vessel, "Hellenic specifically acknowledged receiving and reviewing classification documents that expressly refer to the DNV Rules . . . .  Hellenic specifically admitted before the district court that 'without . . . that condition of class [certificate], we

45

wouldn't have done the deal.'" *Id.* The court also noted that the plaintiff was aware that the inspections would be performed by the defendant and that the vessel's "ability to be flagged and operate in commerce was founded on DNV's classification." *Hellenic*, 464 F.3d at 519. In addition to the "many benefits flow[ing] directly to Hellenic when DNV performed its contract with Inlet," the court stated:

> [T]here is no denying, indeed it is specifically admitted, that, at the critical moment of sale, DNV's performance was essential to Hellenic's decision to purchase the MARIANNA. Any lingering doubt whether Hellenic garnered a benefit from DNV's performance of the DNV-Inlet contract is erased by Hellenic's own statements in its complaint: "DNV knew, or should have known," that its representations "were intended for [Hellenic]'s *guidance and benefit* in a business transaction."

*Id.*

In *Legacy Wireless*, the court found that the signatory to an agreement containing an arbitration clause might be able to prove that a nonsignatory received direct benefits from the agreement, resulting in estoppel. *Legacy Wireless*, 314 F. Supp. 2d at 1056. The court reasoned that under the agreement containing the arbitration clause, one party was to pay the other "administrative fees," and the party receiving the "administrative fees" was obligated to pay a percentage of those fees to a nonsignatory under a separate agreement. *Id.* "[C]onstruing the two agreements together, it appears that [the nonsignatory] received 'direct benefits'" from the agreement with the arbitration clause "in the form of 'administrative fees' paid" under that agreement. *Id.* (footnote omitted).

Similarly, in *World Group Securities, Inc. v. Allen*, No. CV 07-1657-PHX-JAT, 2007

WL 4168572 (D. Ariz. Nov. 20, 2007), the court concluded that the nonsignatory had received direct benefits from a contract with an arbitration provision despite the existence of a pass-through arrangement. In that case, the defendants invested in mutual fund and insurance products through a representative of WMA Securities, Inc. ("WMAS"). *World Group Sec.*, 2007 WL 4168572, at *1. The defendants signed an account agreement with WMAS that contained an arbitration clause. *Id.* World Group Securities, Inc. ("WGS") acquired certain WMAS assets, including the defendants' accounts. *Id.* The defendants instituted arbitration proceedings against WGS, which argued that it was not obligated to arbitrate. *Id.* WGS acknowledged that it knowingly received fees generated from the defendants' accounts after becoming their broker. *Id.* at *4. The court found that the defendants' obligation to pay those fees derived from the agreement containing the arbitration clause. *Id.* The court rejected the theory that the benefit was only indirect because the fees were paid first to providers of investment products, who then paid a portion to WGS. *World Group Sec.*, 2007 WL 4168572, at *4. The court held: "Pass-through arrangements like the one between WGS and the product providers are entirely contingent on the initial obligation. This Court, therefore, does not hesitate to conclude that WGS's fees derived directly from Defendants' obligation to pay them, which is found in the contract containing the arbitration clause." *Id.* (citing *Legacy Wireless*, 314 F. Supp. 2d at 1056). "To hold otherwise would require this Court to ignore the realities of the financial arrangement under consideration." *Id.*

    Other courts have found that benefits are too tangential to invoke estoppel. For

example, in *Thomson-CSF*, the court held that the alleged benefit of eliminating competition was "not the sort of benefit which this Court envisioned as the basis for estopping a nonsignatory from avoiding arbitration." *Thomson-CSF*, 64 F.3d at 779. The nonsignatory had not directly benefitted by seeking to purchase equipment, and the alleged benefit resulted from the nonsignatory's purchase of a signatory, not from the agreement with the arbitration clause. *See id.*

Similarly, in *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 61 (2d Cir. 2001), the court explained that for direct-benefits estoppel to apply, the benefits must be "direct." The court stated that "the benefit derived from an agreement is indirect where the nonsignatory exploits the contractual relation of the parties to an agreement, but does not exploit (and thereby assume) the agreement itself. *Id.* (citing *Thomson-CSF*, 64 F.3d at 778–79). The court found direct-benefits estoppel inapplicable to the nonsignatories, who were successors to the signatories, because "assuming [no alter-ego relationship], there is no relationship between the signatories and the nonsignatory except that they are competitors for the same business." *Id.* at 63.

In *Phoenix Companies, Inc. v. Abrahamsen*, No. 05 Civ. 4894(WHP), 2006 WL 2847812, at *7 (S.D.N.Y. Sept. 28, 2006), the court also found direct-benefits estoppel inapplicable because the benefits were indirect. In *Phoenix Companies*, the nonsignatory derived benefits from the relationship between the parties who had agreed to arbitration, by virtue of various corporate relationships and separate contracts, but the nonsignatory did not have any involvement in the execution or performance of the relevant contract that led to the

48

attachment of an arbitration requirement to certain forms signed by some of the signatories to the contract at issue. *Id.* The nonsignatory also had nothing to do with the signatories' decision to sign the forms with the attached arbitration requirement. *Id.* The court held that "[b]ecause there is no evidence that Phoenix realized any direct benefits from Griffith's relationships with the Financial Advisors, this Court finds that it would be improper to compel arbitration on an estoppel theory." *Id.* (citations omitted).

In *Zurich American Insurance Co. v. Watts Industries, Inc.*, 417 F.3d 682, 684 (7th Cir. 2005), an insurance company insured a company and its subsidiary under a program consisting of both primary liability policies and deductible agreements. The deductible agreements had arbitration clauses, but the primary liability policies did not. *See id.* The subsidiary company did not sign any of the deductible agreements. *Id.* The court noted that the subsidiary had not sought to enforce any rights under the deductible agreements. *Id.* at 688. "Even assuming that [the subsidiary] has benefitted from the deductible agreements by paying lower insurance premiums based on the deductibles, this benefit is too attenuated and indirect to force arbitration under an estoppel theory." *Id.*

In *Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler, P.C.*, No. 08 Civ. 02152(PKL), 2008 WL 759353 (S.D.N.Y. Mar. 20, 2008), the court also found that direct-benefits estoppel did not apply because the nonsignatory did not receive a direct benefit from the contract with the arbitration clause. In that case, an attorney worked for a law firm and left to join another firm. *Id.* at *1. The attorney's professional corporation and the first firm had entered into a contract agreeing to divide the attorney's cases when he left and to divide

49

future fees from certain cases initiated by the attorney. *Id.* That agreement contained an arbitration provision. *Id.* After the attorney moved to his new firm, a dispute arose as to attorneys' fees the second firm was awarded from settling a case that the attorney originated while working at the first firm. *Id.* The first firm initiated arbitration against the attorney, his professional corporation, and his new firm. *Id.* at *2. The new firm argued that it was not a proper party to the arbitration proceedings because it was not a party to the agreement with the arbitration clause. *Barrack, Rodos & Bacine*, 2008 WL 759353, at *2. The first firm responded that the new employer was estopped from avoiding arbitration because it had received attorneys' fees as a "direct benefit" under the Agreement between the attorney and the original firm, fees that otherwise would have been solely the attorney's. *Id.* at *6. The court held that the second firm had:

> "exploited the contractual relation of the parties to an agreement," *MAG Portfolio Consult, GMBH*, [268] F.3d at 61, by taking over the role of counsel in the . . . case. However, [the second firm] has "not exploit[ed] (and thereby assume[d]) the agreement itself." *Id.*

*Barrack, Rodos & Bacine*, 2008 WL 759353, at *6. Although the first firm claimed an interest, which it argued arose from the Agreement, in the fees paid to the second firm, that did not necessarily show that the second firm directly benefitted from the Agreement, but showed at most, the receipt of an indirect benefit from the Agreement. *See id.*

In *In re Kellogg Brown & Root, Inc.*, the court explained:

> [A]lthough a non-signatory's claim may relate to a contract containing an arbitration provision, that relationship does not, in itself, bind the non-signatory to the arbitration provision.

> Instead, a non-signatory should be compelled to arbitrate a claim
> only if it seeks, through the claim, to derive a direct benefit from
> the contract containing the arbitration provision.

166 S.W.3d 732, 741 (Tex. 2005) (citations omitted).  The court explained that "under 'direct benefits estoppel,' a non-signatory plaintiff cannot be compelled to arbitrate on the sole ground that, but for the contract containing the arbitration provision, it would have no basis to sue."  *Id.* at 740.  The court noted: "The work to be performed under a second-tier subcontract will inherently be related to and, to a certain extent, defined by contracts higher in the chain.  If this were a sufficient basis for binding a non-signatory subcontractor, arbitration agreements would become easier to enforce than other contracts, counter to the FAA's purpose."  *Id.* (internal citation omitted).

The Reinsurers have alleged that: "IRIC was created by Huntsman for the purpose of obtaining insurance for Huntsman through the international reinsurance market, of which the Reinsurers are a part," (Docket Entry No. 1 at ¶ 26); "IRIC simply functions as a 'pass through' or shell corporation through which Huntsman deals directly with the Reinsurers," (*id.* at ¶ 28); Huntsman made a claim directly to the Reinsurers for losses relating to the fire at the Plant, (*id.* at ¶ 32); "[t]hroughout the adjustment of Huntsman's claim, Huntsman has dealt directly with the Reinsurers, and the Reinsurers have issued non-allocated interim payments to Huntsman," (*id.*); "IRIC has routinely failed to participate in meetings between Huntsman and the Reinsurers where coverage, quantum and related issues were addressed," (*id.*); the interim payments made by the Reinsurers were "paid pursuant to proofs of loss, which were prepared by the adjuster, submitted to Huntsman, and signed and returned by

51

Huntsman directly to the Reinsurers through the adjuster," (*id.* at ¶ 33); "Huntsman submitted an unsolicited proof of loss directly to Reinsurers through the adjuster," (Docket Entry No. 1 at ¶ 33); "Huntsman claims that it is entitled to additional interim payments from the Reinsurers pursuant to the Certificates . . .," (*id.* at ¶ 38); "Huntsman has corresponded directly with the Reinsurers' representative regarding its claims and has made claims upon the Reinsurers directly, bypassing IRIC entirely," (*id.* at ¶ 44); and "Huntsman has sought to directly receive and has directly received benefits under the Certificates, by requesting payment directly from the Reinsurers," (*id.*).

The issue at this stage is not whether these allegations are true or whether the claims based on these allegations will ultimately succeed.  Under the case law, the Reinsurers' allegations provide a plausible basis for proving that Huntsman received direct benefits from the Reinsurance Certificates.  Specifically, the Reinsurers have alleged facts that would support the theory that Huntsman has acted to receive direct benefits from the Reinsurance Certificates in ways that under the cases would support applying direct-benefits estoppel, such as relying on the signatories' performance of the contract containing the arbitration clause, *see Hellenic*, 464 F.3d at 519; asserting that monetary compensation is owed under the contract with the arbitration clause, *see Weekley Homes*, 180 S.W.3d at 133; and receiving monetary compensation flowing from obligations under the contract with the arbitration clause, *see Legacy Wireless*, 314 F. Supp. 2d at 1056.  The Reinsurers have alleged that Huntsman was more than a knowing recipient of funds ultimately paid by the Reinsurers because Huntsman directly demanded payment from the Reinsurers.  The

Reinsurers' allegations differ from those in cases finding benefits to be merely indirect.  For example, the allegations that Huntsman sought and received monetary payment from the Reinsurers under the Certificates alleges direct benefits from the contracts containing the arbitration provision, compared to the indirect benefit of eliminating competition as a result of purchasing a signatory to a contract with an arbitration clause, *see Thomson-CSF*, 64 F.3d at 779; receiving benefits by acquiring a signatory to an arbitration agreement, *see MAG Portfolio Consult*, 268 F.3d at 61–63; paying lower insurance premiums, *see Zurich Am. Ins.*, 417 F.3d at 688; or obtaining attorneys' fees as a result of an employee's earlier contract with another law firm on distribution of fees, *see Barrack, Rodos & Bacine*, 2008 WL 759353, at *6.

The Reinsurers ultimately may be able to show only that Huntsman benefitted from IRIC's contractual relationship with the Reinsurers and not from the Reinsurance Certificates themselves.  For example, discovery may reveal that Huntsman had nothing to do with the execution and performance of the contracts resulting in the arbitration agreement, *see Phoenix Cos.*, 2006 WL 2847812, at *7.  But the Reinsurers' allegations that Huntsman dealt directly with the Reinsurers and sought payment directly under the Reinsurance Certificates alleges a plausible basis for the Reinsurers to show that Huntsman received direct benefits under the Reinsurance Certificates.  Dismissal is unwarranted.

This result is supported by *World Omni Financial Corp. v. ACE Capital Re Inc.*, 64 F. App'x 809 (2d Cir. 2003) (unpublished), which involved similar facts.  In *World Omni*, an insured sought coverage from a company referred to as ACE Overseas.  64 F. App'x at

811.  On discovering that ACE Overseas was not licensed to provide direct insurance coverage, the insured created a captive insurance company to provide direct insurance.  *Id.* ACE Overseas reinsured the captive insurance company for 100% of its liability to the insured.  *Id.*  After a coverage dispute, the insured sued ACE, an ACE Overseas affiliate, that had agreed to procure the insurance for the insured through ACE Overseas.  *Id.*  ACE moved for dismissal or summary judgment on several grounds, including that World Omni had to arbitrate any insurance dispute with ACE or ACE Overseas.  *Id.*  As in the present case, the reinsurance agreement between the captive insurer and the reinsurer contained an arbitration clause, but the insurance agreement between the insured and the captive insurer did not.  *Id.* at 811–12.  The district court denied the motion to dismiss, finding that the facts pleaded could support a finding that the reinsurer acted as the insured's direct insurer.  *World Omni*, 64 F. App'x at 812.

On appeal, the Second Circuit pointed out that even though World Omni asserted that it only sought recovery under the agreement with its insurer, its complaint charged the reinsurers with breaching the reinsurance agreement and demanded payment under both the insurance and the reinsurance agreements.  *World Omni*, 64 F. App'x at 813.  The Second Circuit held that "[t]o the extent World Omni pursues claims against ACE/ACE Overseas that fall within the scope of the arbitration clause contained in the reinsurance agreement, we conclude that it is estopped from denying a duty to arbitrate."[9]  *Id.* at 813 (citing *ACE Capital*

---

[9] Because of this holding, the court did not reach the argument that the insured was bound as the "alter ego" of the captive insurance company.  *World Omni*, 64 F. App'x at 813.

*Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 34 (2d Cir. 2002)).  In evaluating

the scope of the arbitration agreement, the court concluded:

> Where, as in this case, the parties are all sophisticated corporate
> entities, no one of them should be able to gain an unfair
> advantage over the other by denying the reality of a bargain
> effected through two contracts with very different arbitration
> expectations.  Indeed, under such circumstances, a court may
> properly sever those claims subject to arbitration from those
> adjudicable in court.

*Id.* (citing *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995)).

The court held that the nonsignatory was bound to arbitrate under direct-benefit estoppel but

remanded to allow the district court to determine the scope of the arbitration clause.  *Id.*

　　　As in *World Omni*, the facts the Reinsurers pleaded could support a finding that the

Reinsurers acted as Huntsman's direct insurer.  The insured in *World Omni* sued the

reinsured as a third-party beneficiary of the reinsurance contract.  The Reinsurers have

alleged that Huntsman requested payments directly from them under the Reinsurance

Certificates.  The Reinsurers have alleged facts supporting the theory that Huntsman

requested and received direct benefits under the Reinsurance Certificates.  The remaining

issue is whether the fact that Huntsman has not directly sued the Reinsurers precludes the

application of estoppel.

　　　In *Wood*, this court found that although the Fifth Circuit in *Bridas* declined to apply

direct-benefits estoppel after noting that the nonsignatory had not sued the signatory under

the agreement containing the arbitration clause, "[t]he opinion does not reveal any indication

that the Government of Turkmenistan had otherwise demanded or accepted benefits under

the contract.  The court did not consider whether such conduct during the contract's life could have supported direct-benefits estoppel." *Wood*, 458 F. Supp. 2d at 368.  While the *Bridas* court found direct-benefits estoppel inapplicable because the nonsignatory had not sued for benefits under the contract containing the arbitration clause, the court did not address whether direct-benefits estoppel could still be invoked if the nonsignatory had otherwise sought direct benefits under the contract.  In *Wood*, this court noted that "[o]ther cases have not focused on whether the nonsignatory filed a suit or claim against the signatory based on the agreement containing the arbitration clause but, as in *DuPont*, focused instead on whether the evidence showed that the nonsignatory received direct and substantial benefits from that agreement." *Wood*, 458 F. Supp. 2d at 368.  This court held: "[t]he keys are whether the nonsignatory demanded and received substantial and direct benefits under the contract containing the arbitration clause, by suing the signatory under that contract or otherwise; the relationship between the claims to be arbitrated and the contract; and whether equity prevents the nonsignatory from avoiding the arbitration clause that was part of that contract." *Id.* at 371.  This court concluded in *Wood* that suing under the contract with the arbitration clause was not necessary under the facts presented, stating:

> Although Wood has not sued PennTex and has not sued under the Agreement containing the arbitration clause, he is the plaintiff in a case that by its continued existence allegedly violates the Agreement, from which he has directly and substantially benefitted. . . .  The unique fact of this case is that although Wood did not sue PennTex, he is the plaintiff in the suit that is the subject of the dispute between them.

*Id.* at 372.

In this case, as in *Wood*, the nonsignatory—Huntsman—has not sued a signatory to the contract containing the arbitration provision or sued to enforce that contract. But other facts justify application of direct-benefits estoppel. The Reinsurers have alleged that Huntsman sought and obtained direct benefits under the Reinsurance Contracts in the form of insurance proceeds. In addition, the claims the Reinsurers seek to arbitrate are directly related to the Reinsurance Certificates because they resolve the Reinsurers' liability under the Certificates. At this stage, the issue is not whether the disputes between the Reinsurers and Huntsman must be submitted to arbitration. The Reinsurers' allegations that Huntsman sought and received direct benefits under the Reinsurance Certificates makes dismissal of the claim that Huntsman must arbitrate inappropriate despite the fact that Huntsman has not sued the Reinsurers under those Certificates. The allegations supporting the application of direct-benefits estoppel save the claim against Huntsman for arbitration from dismissal at this stage.

In sum, the Reinsurers have failed to state a claim for relief under theories of assumption, agency, alter ego, or third-party beneficiary, but have pleaded facts that show a plausible basis for relief under direct-benefits estoppel. The motion to dismiss is denied with respect to the Reinsurers' claim against Huntsman to compel arbitration.

### B. Huntsman's Motion to Dismiss the Reinsurers' Claim for Declaratory Relief Under Rule 12(b)(6)

Huntsman also seeks dismissal of the Reinsurers' claim for a declaratory judgment on coverage. (Docket Entry No. 8 at 17–22). This court has already determined that the primary claim against Huntsman to compel arbitration should not be dismissed. The

Reinsurers seek declaratory judgment only in the alternative, in the event that their claim to compel arbitration fails.  If the claim to compel arbitration does succeed, some or all of the coverage disputes would be decided by the arbitrators, not through a declaratory judgment from this court.  It will not be clear which coverage disputes, if any, will need to be resolved by this court until arbitrability and the scope of any arbitration is determined.  Huntsman's motion to dismiss the Reinsurers' claims for declaratory relief is denied without prejudice. A schedule for discovery on arbitrability is set forth later in this opinion.  The parties may supplement the record after such discovery and if appropriate file cross-motions for summary judgment on the arbitrability issue.  If it is determined that all or a portion of this case will not be arbitrated, the Reinsurers' may reurge their request for declaratory relief.

### C.   IRIC's Motion to Dismiss Under Rule 12(b)(1) and Rule 12(b)(6)

#### 1.   Treatment as a Facial or Factual Attack to Jurisdiction

A threshold issue is whether to treat IRIC's motion to dismiss under Rule 12(b)(1) as a facial or a factual attack on this court's subject-matter jurisdiction.  IRIC has attached to its motion to dismiss an exemplar Reinsurance Certificate and a copy of Huntsman's petition against IRIC filed in Texas state court.   The Reinsurers also attached an exemplar Reinsurance Certificate to their complaint.  The Huntsman state-court petition does not bear on IRIC's ripeness, standing, or arbitrability-prerequisites arguments, and this court may take judicial notice of the complaint in the state-court suit.[10]  *See Lowrey v. Tex. A&M Univ. Sys.,*

---

[10] Huntsman's state-court lawsuit was removed to federal court in the Eastern District of Texas–Beaumont Division, and was subsequently transferred to this court.

117 F.3d 242, 246 n.3 (5th Cir. 1997) ("Although the pleadings in this subsequent lawsuit are not part of the record on appeal in the instant case, we may take judicial notice of pending judicial proceedings.").  Because the motion to dismiss under Rule 12(b)(1) was not submitted with additional evidence, analysis is properly limited to the pleadings, attachments, and matters appropriate for judicial notice.  *See Hussain v. Mueller*, No. H-07-2755, 2008 WL 2557565, at *2 (S.D. Tex. June 20, 2008) ("A facial attack, which consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence, challenges the court's jurisdiction based solely on the pleadings.  When presented with a facial challenge to subject-matter jurisdiction, the court examines whether the allegations in the pleadings are sufficient to invoke the court's subject matter jurisdiction, assuming the allegations in the pleadings to be true.") (internal citation omitted).

### 2.    Ripeness

Ripeness is required for this court to exercise jurisdiction.  *See Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002) ("[R]ipeness is a constitutional prerequisite to the exercise of jurisdiction.") (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)).  "When determining whether a controversy is ripe for adjudication, courts consider 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  *In re Workers' Comp. Refund*, 46 F.3d 813, 821 (8th Cir. 1995) (quoting *Abbott Labs.*, 387 U.S. at 149).  "[W]hether particular facts are sufficiently immediate to establish an actual controversy yields answers on a case-by-case basis."  *Shields*, 289 F.3d at 835 (citation omitted).

Indemnity disputes ordinarily are not ripe until the underlying obligation is determined. *See Lear Corp. v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003) ("We regularly say that decisions about indemnity should be postponed until the underlying liability has been established.") (citing *Nationwide Ins. Co. v. Zavalis*, 52 F.3d 689, 693 (7th Cir. 1995); *Grinnell Mut. Reinsurance Co. v. Reinke*, 43 F.3d 1152, 1154 (7th Cir. 1995); *Travelers Ins. Cos. v. Penda Corp.*, 974 F.2d 823, 833 (7th Cir. 1992)). In *Lear*, the court explained that "[a] declaration that A must indemnify B if X comes to pass has an advisory quality; and if the decision would not strictly be an advisory opinion (anathema under Article III)[,] it could be a mistake, because it would consume judicial time in order to produce a decision that may turn out to be irrelevant." *Id.* The *Lear* court distinguished between decisions on indemnity and decisions on the duty to defend:

> Declaratory decisions about indemnity differ in this respect from the more common decision that an insurer has a duty to defend the client in ongoing litigation. Defense may be required even if there never turns out to be any liability to indemnify; and a court that has devoted considerable effort to determining the scope of a defense obligation to resolve the parties' immediate dispute may find it prudent to specify the scope of an indemnity duty at the same time if that subject also is in debate.

*Id.*

IRIC filed a third-party complaint against the Reinsurers in the related Huntsman Case pending before this court, seeking a declaratory judgment that the Reinsurers must accept IRIC's tender of the defense of Huntsman's claims in that case and a declaratory judgment that if the Reinsurers refuse, they are obligated to compensate IRIC for all liability it incurs.

Alternatively, in the Huntsman Case, IRIC seeks to arbitrate its disputes with the Reinsurers under the dispute-resolution procedure in the Reinsurance Certificates. "The threat of litigation can establish a justiciable controversy if it is specific and concrete. We look to the practical likelihood that a controversy will become real." *Shields*, 289 F.3d at 835 (internal citation omitted). The facts show more than a threat of litigation. IRIC has in fact filed suit against the Reinsurers. As explained in *Lear*, a duty to defend may be ripe even if the underlying liability has not been established, and an indemnity dispute may be decided at the same time as the underlying liability dispute. *See Lear*, 353 F.3d at 583. The Huntsman Case is pending before this court and may ultimately be consolidated with this case. The Reinsurers' duty to defend may become an issue in this case, making it prudent to determine disputed indemnity issues at the same time.

In addition, if it is determined that arbitration is warranted, questions of the ripeness of the underlying disputes between IRIC and the Reinsurers ultimately may be determined by the arbitrators. *See Pioneer Navigation Ltd. v. Maritime Enters., Inc.*, No. 95-1054, 1995 WL 517137, at *2 (E.D. La. Aug. 30, 1995) (concluding that because the parties included a broad arbitration clause in their contract, "this court's role is limited to staying the litigation and allowing the arbitrators to resolve all issues under the [contract], *including the issue of ripeness of an issue for arbitration*.")[11] (emphasis added); *see also Albritton v. W.S. Badcock*

---

[11] The court in *Pioneer Navigation* noted that "[a]n arbitration clause containing language stating that it covers 'any dispute' is of the broad type." *Pioneer Navigation*, 1995 WL 517137, at *2. The arbitration clause in the Reinsurance Certificates contains such broad language, stating that:

Where *any dispute between the parties arising out of or in connection with*

*Corp.*, Nos. 1:02-CV378-D-D, 1:02-CV379-D-D, 2003 WL 21018636, at *4 (N.D. Miss. Apr. 7, 2003) (rejecting argument that motion to compel arbitration was not ripe because "[t]he Supreme Court . . . has recently held that procedural questions such as ripeness are for an arbitrator, not for the court, to decide.") (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002)).

At this stage, this court is not determining the merits of the underlying disputes, arbitrability, or the appropriate time for arbitration, if any. This court merely determines at this stage whether the claim to compel arbitration may proceed. According to the allegations in the complaint, IRIC has not acted as a traditional insurer and has failed to participate in meetings between Huntsman and the Reinsurers on coverage issues. (*See* Docket Entry No. 1 at ¶ 32). The complaint also alleges that IRIC, through its "actions and/or inaction, [has] adopted all of Huntsman's coverage positions." (*Id.*). The alleged relationship between IRIC and Huntsman and Huntsman's request for additional disputed payments from the Reinsurers make the Reinsurers' dispute with both IRIC and Huntsman justiciable.

The fact that IRIC's liability to Huntsman under the Huntsman-IRIC Policy has not yet been determined does not does not warrant dismissal of the Reinsurers' claim to compel arbitration with IRIC at this time. The Reinsurers' liability to IRIC under the Reinsurance

_____

*this Agreement* including formation and validity and whether arising during or after the period of this Agreement has not been settled through negotiation, both parties agree to try in good faith to settle such dispute by non binding mediation, before resorting to arbitration in the manner set out below.

(Docket Entry No. 1, Ex. 1 at § (C)(13) (emphasis added)).

Certificates is intertwined with IRIC's demand that the Reinsurers accept IRIC's tender of defense in the Huntsman Case, and the Huntsman Case is now pending before this court and may ultimately be consolidated with this case.  In addition, the facts alleged in the complaint as to IRIC's failure to participate in meetings about insurance coverage and IRIC's adoption of Huntsman's coverage positions support the Reinsurers' position that their disputes with Huntsman are the same disputes that they have with IRIC.  Under the facts alleged, Huntsman has directly requested payment under the Reinsurance Certificates from the Reinsurers and IRIC has failed to participate in meetings on coverage issues, effectively eliminating IRIC as the "middleman" in the dispute between the Reinsurers and Huntsman.  Because IRIC has allegedly removed itself from the coverage process, the Reinsurers have the same disputes with IRIC that they have with Huntsman.  *Cf. Aid Ass'n for Lutherans v. Radmer*, No. 99-C-1205, 2001 WL 34388864, at *9 (E.D. Wis. Oct. 31, 2001) (rejecting the "novel argument" that the plaintiffs did not have standing to compel arbitration because of failure to comply with requirements of internal appeal and mediation before arbitration, and holding that "[t]he court is not persuaded that respondents can create a ripeness issue by refusing to take the necessary steps to be entitled to arbitrate their dispute and filing a lawsuit instead.") (citing *Southwestern Elec. Power Co. v. Local Union No. 738, Int'l Bhd. of Elec. Workers, AFL-CFO*, 293 F.2d 929, 932 (5th Cir. 1961)), *aff'd sub nom. Hawkins v. Aid Ass'n for Lutherans*, 338 F.3d 801 (7th Cir. 2003).  The disputes over Huntsman's payment demand, the Reinsurers' obligation to accept the tendered defense, and the parties' obligation to submit their disputes to arbitration, are concrete and live disputes.  Dismissal is not

warranted on ripeness grounds at this time.

IRIC also alleges that the Reinsurers have failed to comply with the negotiation and mediation prerequisites to arbitration required under the dispute-resolution provision of the Reinsurance Certificates.  According to IRIC, failure to comply with these prerequisites deprives this court of jurisdiction to hear the Reinsurers' claim to compel arbitration.  Courts distinguish between procedural arbitrability and substantive arbitrability:

> We recognize three challenges to an arbitrator's authority: jurisdictional challenges of a procedural nature, jurisdictional challenges of a substantive nature, and challenges that relate to the merits of the arbitrators' decision.  *Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp.*, 380 F.3d 1084, 1098 (8th Cir. 2004).  Jurisdictional challenges of a substantive nature are for judicial resolution whereas jurisdictional challenges of a procedural nature are appropriate for submission to the arbitrators.  *Id.*

*Int'l Bhd. of Elec. Workers, Local Union No. 124 v. Smart Cabling Solutions, Inc.*, 476 F.3d 527, 529 (8th Cir. 2007).  Determining compliance with contractual prerequisites to arbitration is in the procedural arbitrability category.  *See, e.g.*, *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85 (2002) ("'[I]ssues of procedural arbitrability, *i.e.*, whether prerequisites such as *time limits*, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide.'") (emphasis added by *Howsam* court) (quoting REVISED UNIFORM ARBITRATION ACT § 6, cmt. 2, 7 U.L.A. 13 (Supp. 2002)); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964) ("Doubt whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow

them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration. . . .  Once it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator."); *White Packing Co. v. Local 174, Butchers, Food Handlers & Allied Workers Union*, No. 82-Civ. 3780, 1982 WL 2066, at *3 (S.D.N.Y. Sept. 24, 1982) ("[T]he lower courts have consistently held that questions of procedural arbitrability such as a party's timeliness in requesting arbitration and a party's compliance with pre-arbitration grievance procedures should be decided by the arbitrator rather than the court.") (citations omitted); *accord In re R & R Personnel Specialists of Tyler, Inc.*, 146 S.W.3d 699, 705 (Tex. App.—Tyler 2004, orig. proceeding) ("Such questions [of procedural arbitrability] encompass determinations whether conditions precedent to arbitration, such as notice and time limits, have been met and are for the arbitrator to decide.") (citing *Howsam*, 537 U.S. at 84).

Courts have held that challenges to whether prerequisites of negotiation or mediation have been met are properly decided by arbitrators, not courts.  *See Smart Cabling Solutions*, 476 F.3d at 529–30 (rejecting the argument that meetings between the arbitrators were not "bona fide" negotiations and that as a result a condition precedent for arbitration was not satisfied because the argument was procedural and should have been presented to the arbitrator) (citing *Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp.*, 380 F.3d 1084, 1099 (8th Cir. 2004); *Int'l Ass'n of Bridge, Structural, Ornamental, &*

*Reinforcing Ironworkers, Shopman's Local 493 v. EFCO Corp. & Constr. Prods., Inc.*, 359

F.3d 954, 956 (8th Cir. 2004)); *R & R Personnel Specialists of Tyler*, 146 S.W.3d at 705

(finding that questions of whether party had complied with written notice requirement, notice

deadlines, and requirement to participate in mediation before seeking arbitration "relate[d]

to procedural arbitrability and [were] therefore questions for the arbitrator to decide.") (citing

*Howsam*, 537 U.S. at 84).

Despite the case law holding that the question of whether parties have met

prerequisites to arbitration is for the arbitrator, IRIC contends that this court should decide

whether the Reinsurers have complied with the negotiation and mediation requirements of

the dispute-resolution provision under an exception to the general rule recognized in *John

Wiley*. (*See* Docket Entry No. 32 at 8). IRIC bases its argument on the following language

in *John Wiley*:

> Once it is determined, as we have, that the parties are obligated
> to submit the subject matter of a dispute to arbitration,
> 'procedural' questions which grow out of the dispute and bear
> on its final disposition should be left to the arbitrator. Even
> under a contrary rule, a court could deny arbitration only if it
> could confidently be said not only that a claim was strictly
> 'procedural,' and therefore within the purview of the court, but
> also that it should operate to bar arbitration altogether, and not
> merely limit or qualify an arbitral award.

*John Wiley*, 376 U.S. at 557–58. The Court explained that "[i]n view of the policies favoring

arbitration and the parties' adoption of arbitration as the preferred means of settling disputes,

such cases are likely to be rare indeed." *Id.* at 558.

The Fifth Circuit has "interpreted this rare exception to mean that 'a court will not

order arbitration if 'no rational mind' could question that the parties intended for a procedural provision to preclude arbitration and that the breach of the procedural requirement was clear.'"[12] *Gen. Warehousemen & Helpers Union Local 767 v. Albertson's Distrib., Inc.*, 331 F.3d 485, 488 (5th Cir. 2003) (quoting *Oil, Chem. & Atomic Workers' Int'l Union, Local 4-447 v. Chevron Chem. Co.*, 815 F.2d 338, 342 (5th Cir. 1987)).  Without citation, IRIC argues that "[w]hether or not negotiation or mediation has occurred is clearly a strictly procedural matter that requires no analysis of the underlying claims of this suit."  (Docket Entry No. 32 at 8).

Courts considering whether parties have complied with procedural prerequisites to arbitration, including requirements to participate in negotiation or mediation, have held that the issue should be decided by the arbitrator.  *See Smart Cabling Solutions*, 476 F.3d at 529–30; *R & R Personnel Specialists of Tyler*, 146 S.W.3d at 705.  The complaint alleges that IRIC has refused to participate in negotiations on coverage issues and that the Reinsurers have requested IRIC and Huntsman to mediate before arbitration starts, (*see* Docket Entry No. 1 at ¶¶ 32, 45).  This court cannot conclude that "no rational mind" could question: (1) that the negotiation and mediation requirements were intended as a complete bar to arbitration, or (2) that the breach of these requirements is clear.  If arbitration is compelled, IRIC's arguments on the prerequisites to arbitration may be raised before the arbitrators.  The

---

[12] Although the court recognized this exception, it found it inapplicable to the facts presented, concluding that "[b]ecause a rational mind could conclude, from the union's evidence, that it complied with the CBA's procedural rules, the district court should have entered an order to compel arbitration and let the arbitrator decide these questions."  *Gen. Warehousemen & Helpers Union Local 767 v. Albertson's Distrib., Inc.*, 331 F.3d 485, 488 (5th Cir. 2003).

Reinsurers' claim to compel arbitration does not lack ripeness because of an alleged failure to comply with negotiation and mediation procedures before arbitration. The Reinsurers' claim that IRIC must arbitrate its disputes with the Reinsurers will not be dismissed on ripeness grounds.

### 3.    Standing

IRIC's request that the Reinsurers' claim to compel arbitration be dismissed for lack of standing fails for similar reasons. Standing requires a plaintiff to establish at least three elements. *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 721 (5th Cir. 2007) (citation omitted). "First, plaintiffs must show that they have suffered 'an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical.'"" *Id.* at 722 (citation omitted). "Second, plaintiffs must establish 'a causal connection between the injury and the conduct complained of.'" *Id.* (citation omitted). "Finally, it must be likely that the injury 'will be redressed by a favorable decision.'" *Id.* (citation omitted). IRIC bases its request for dismissal for lack of standing on the same arguments used for dismissal for lack of ripeness—that the alleged injury is speculative because IRIC's liability to Huntsman has not yet been determined and that the prerequisites to arbitration have not been met. (*See* Docket Entry No. 11 at 11–12). The standing argument fails for the same reasons that the ripeness argument fails. The Reinsurers have alleged a concrete injury—that they are being deprived of their contractual right to arbitrate—and that this injury is caused by IRIC's refusal to arbitrate under the Reinsurance Certificates' dispute-resolution provisions. The Reinsurers' alleged injury would be

68

redressed by a decision compelling arbitration.  The Reinsurers have standing to request an order compelling arbitration.  IRIC's motion to dismiss for lack of jurisdiction is denied.

### 4.        IRIC's Motion to Dismiss Under Rule 12(b)(6)

IRIC also seeks dismissal of the Reinsurers' claim to compel arbitration under Rule 12(b)(6).  (*See* Docket Entry No. 11 at 12–14).  IRIC again relies on the arguments that the Reinsurers' claim is speculative because it precedes a liability determination and because the Reinsurers have not met the procedural prerequisites to arbitration.  (*See id.*).  These arguments are again rejected for the reasons discussed earlier in connection with IRIC's request for dismissal under Rule 12(b)(1).[13]

### 5.        IRIC's Request for Dismissal of the Reinsurers' Declaratory Judgment Claims

IRIC also requests that the Reinsurers' claims for declaratory relief be dismissed, again relying on the arguments that the Reinsurers' liability follows IRIC's liability to Huntsman, that liability under the Huntsman-IRIC Policy is not yet established, and that the dispute-resolution provision in the Reinsurance Certificates requires negotiation and mediation before arbitration.  (*See* Docket Entry No. 11 at 14–15).  Because the Reinsurers' declaratory judgment claims are made in the alternative to the arbitration claims, the arguments for dismissal of the declaratory judgment claims are better resolved after a determination as to whether any of this dispute will be arbitrated.  Discovery on arbitrability

---

[13] In response to IRIC's motion to dismiss, the Reinsurers have submitted the same sealed exhibits they submitted in response to Huntsman's motion to dismiss.  This court declines to consider these additional materials and declines to convert IRIC's motion to dismiss into a motion for summary judgment for the same reasons this court declines to convert Huntsman's motion into a motion for summary judgment.

will proceed, followed by an opportunity to supplement the record and to make appropriate cross-motions for summary judgment. The parties may reurge their arguments to dismiss the declaratory judgment claims if any portion of this case is not submitted to arbitration. IRIC's motion to dismiss the declaratory judgment claims is dismissed without prejudice.

### D.     The Reinsurers' Motion to Enjoin State-Court Litigation

The Reinsurers have moved under the All Writs Act, 28 U.S.C. § 1651, and the Anti-Injunction Act, 28 U.S.C. § 2283, to enjoin the Huntsman Case filed in Jefferson County, Texas. (Docket Entry No. 27). Since the Reinsurers filed this motion, the Reinsurers removed the Huntsman Case to federal court in the Eastern District of Texas—Beaumont Division, and the case was subsequently transferred to this court. By separate opinion entered in that case, 4:08-cv-01542, this court is denying Huntsman's motion to remand that case to state court. As a result, the Huntsman Case remains pending in this court and may ultimately be consolidated with this case. If that occurs, the Reinsurers may move to stay as appropriate pending the arbitrability determination, and Huntsman and IRIC could present any opposition. Because the state-court litigation no longer remains in state court, the motion to enjoin the state-court litigation is denied as moot.

## IV.    Schedule for Discovery on Arbitrability Issue

During oral argument regarding the motions to dismiss, the parties disputed the scope of proper discovery in the event the motions to dismiss were denied or converted into Rule 56 motions. The parties estimated that it would take approximately two months to conduct arbitrability discovery, limited to the issues of the steps Huntsman took to obtain reinsurance

70

and the steps Huntsman took to adjust the claim and obtain payment.  The arbitrability discovery must be completed by **December 1, 2008**.  The parties may supplement the record and file appropriate motions for summary judgment on the arbitrability issue by **December 22, 2008**.

## V.      Conclusion

Huntsman's motion to dismiss, (Docket Entry No. 8), and IRIC's motion to dismiss, (Docket Entry No. 11), are denied.  The Reinsurers' motion to enjoin the state-court litigation, (Docket Entry No. 27), is denied as moot.

SIGNED on September 26, 2008, at Houston, Texas.

Lee H. Rosenthal
United States District Judge